

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
03/16/2016

| | | |
|---|---|---|
| IN RE: | § | |
| **HOUSTON REGIONAL SPORTS** | § | **CASE NO: 13-35998** |
| **NETWORK, L.P.,** | § | |
| Debtor. | § | |
| | § | **CHAPTER  11** |
| | § | |
| **ROBERT E OGLE,** | § | |
| Plaintiff | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 15-03144** |
| | § | |
| **COMCAST CORPORATION, INC.,** *et al* | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Comcast Corporation, Comcast Sports Management Services, LLC, Comcast Cable Communications, LLC, Houston SportsNet Finance, LLC, Houston SportsNet Holdings, LLC, National Digital Television Center, LLC, Comcast SportsNet California, LLC, NBCUniversal Media, LLC, Jon Litner, John Ruth, Robert Pick, and Madison Bond have filed a motion to dismiss Robert E. Ogle's complaint for failure to state a claim upon which relief may be granted. The motion is granted in part and denied in part.  The following claims are dismissed:

- Count 2: Fraud by nondisclosure

- Count 3: Business disparagement

- Count 6: Breach of fiduciary duty

- Count 7: All breach of contract claims against NBCUniversal Media, LLC, and all claims pursuant to §§ 2.2(e) and 2.5 of the Comcast Services Agreement.  The motion to dismiss is denied as to the claim against Comcast Sports Management Services, LLC, under § 2.4 of the Comcast Services Agreement.

- Count 10: Conspiracy

The motion to dismiss is denied with respect to all other claims.

### Alleged Facts

In 2003, the Astros[1] and Rockets[2] formed Houston Regional Sports Network, L.P. ("the Debtor"), a Delaware limited partnership, in order to produce and distribute content relating to Houston's sports teams, including the Houston Astros, the Houston Rockets, and the Houston Dynamo, a Major League Soccer franchise.  (ECF No. 1 at 11).  The Debtor originally consisted of two limited partners, Rockets Partner, L.P. ("Rockets Partner") and Houston McLane Company, LLC ("Houston McLane"), representing the Astros.  *Id.*  The general partner was Houston Regional Sports Network, LLC, a Delaware limited liability company comprised of two members: JTA Sports, Inc. ("Rockets Member") and Houston McLane.  (ECF No. 1 at 12).  In 2010, Houston McLane transferred its limited partnership interest in the Debtor to McLane HRSN LP Holdings, LLC ("Astros Partner") and its membership interest in the general partner to McLane HRSN GP Holdings, LLC ("Astros Member").  *Id.*

Rockets Partner and Rockets Member are affiliates of Rocket Ball, Ltd. ("Rocket Ball"), the owner of the Houston Rockets.  Rocket Ball owns the exclusive right to exhibit, exploit, and license the right to distribute programming related to the Houston Rockets.  *Id.*  Rocket Ball and Debtor were parties to a Media Rights License Agreement which granted the Debtor the exclusive right and license to produce and exhibit certain Houston Rockets content, including live television broadcasts of games.  *Id.*

Prior to 2011, Astros Partner and Astros Member were affiliates of Houston McLane, the owner of the Houston Astros.  *Id.*  In 2011, Houston Baseball Partners LLC ("HBP") purchased

---

[1]  The term "Astros" refers to Houston Astros, LLC and/or its affiliates and predecessors in interest including McLane Company, LLC d/b/a the Houston Astros.  The term "Houston Astros" refers to Major League Baseball's Houston Astros franchise.

[2]  The term "Rockets" refers to Rockets Partner, L.P., JTA Sports, Inc., Rocket Ball, Ltd. and/or their affiliates and predecessors in interest.  The term "Houston Rockets" refers to the National Basketball Association's Houston Rockets franchise.

the Houston Astros from Houston McLane.  Astros Partner and Astros Member are affiliates of Houston Astros, LLC ("Astros LLC"), an HBP affiliate and current owner of the Houston Astros.  *Id.*  Just as with Rocket Ball, Astros LLC holds the exclusive right to license programming for the Houston Astros and has granted the Debtor broadcasting rights over Houston Astros games through a Media Rights Agreement.  *Id.* at 11-12.

*Comcast Buys a Stake in the Debtor*

In 2010, Comcast Corporation, the leading cable provider in the Houston area as well as the owner of a chain of regional sports networks, expressed an interest in purchasing a stake in the Debtor.  *Id.* at 12.  On October 29, 2010, Houston SportsNet Holdings, LLC (the "Comcast Partner") was admitted as a limited partner in the Debtor and a member of the general partner. Comcast Partner owned a 22.443% stake in the Debtor, while Rockets Partner, Astros Partner, and the general partner held 30.923%, 46.384%, and 0.25% stakes, respectively.  *Id.*  Comcast Partner also held a 22.5% interest in the general partner, with 31% for Rockets Member and 46.5% for Astros Member.  *Id.*  The network was rebranded as Comcast SportsNet Houston ("CSN Houston").

The rights and responsibilities of the partners were governed by the Second Amended and Restated Agreement of Limited Partnership of Houston Regional Sports Network, L.P. (the "LP Agreement").  Pursuant to the LP Agreement, the Debtor was managed by the general partner, which was itself managed by a board of directors and governed by the Second Amended and Restated Limited Liability Company Agreement of the General Partner (the "LLC Agreement").  *Id.* at 13.  The board consisted of one director appointed by Rockets Member, one by Astros Member, and two by Comcast Partner (Defendants Jon Litner and John Ruth).  *Id.*

Significantly, the LLC Agreement required unanimous consent of all directors for the Debtor to take certain actions.  *Id.*

Simultaneous with Comcast's acquisition of a stake in the network, the Debtor entered into various agreements with certain Comcast affiliates, including the following:

- A credit agreement and security agreement with Houston SportsNet Finance, LLC ("Comcast Lender") by which Comcast Lender agreed to lend the Debtor $100 million over time.  In return, the Debtor provided Comcast Lender security interests in certain assets.

- A Services Agreement with Comcast Sports Management Services, LLC ("Comcast Services") pursuant to which Comcast Services agreed to provide management oversight and certain enumerated operation services (including affiliate sales services, affiliate finance services, executive oversight services, operations and engineering, etc.), identification of prospective MVPDs,[3] and negotiation with MVPDs interested in carrying CSN Houston.

- An affiliation agreement with Comcast Cable Communications, LLC ("Comcast Cable") under which Comcast Cable carried CSN Houston on its cable system in exchange for a monthly per-subscriber rate which varied based upon the territory of the subscriber.

*Id.* at 13-14.

The Debtor also executed an Amended and Restated Media Rights Agreement with Houston McLane on October 29, 2010, pursuant to which the Debtor's right to broadcast Houston Astros' games was extended through 2032.  *Id.* at 14.  In exchange, the Debtor agreed to make periodic payments totaling several hundred million dollars to Houston McLane.  Similarly, the Debtor extended its broadcasting rights with Rocket Ball through 2032, also agreeing to make periodic payments totaling several hundred million dollars.  *Id.*  Under both agreements, if the Debtor failed to make a required media rights payment and failed to cure the default within sixty days, the Astros and Rockets would each be entitled to terminate their respective Media Rights Agreement.  *Id.* at 15.

---

[3] A "multichannel video programming distributor."

*Ogle's Allegations that Comcast Began to Cripple the Debtor Financially*

Ogle is the trustee of the HRSN Litigation Trust, a litigation trust created pursuant to the Debtor's Third Amended Chapter 11 Plan of Reorganization confirmed on October 30, 2014. (Case No. 13-35998; ECF No. 772).  In that capacity, Ogle alleges that, starting at the latest in 2013, Comcast decided it would acquire the Debtor's most valuable assets, i.e. the right to broadcast Houston Astros and Houston Rockets programming for itself, rather than work with its partners to make the Debtor successful.  *Id.*  In February of 2012, Comcast Services and its affiliate NBCUniversal Media, LLC ("NBCU"), had begun to reach out to various MVPDs in anticipation of a planned October 2012 launch of CSN Houston.  *Id.*  On February 28, 2012, the board of directors approved the 2012 budget for the debtor based on a business plan prepared by Comcast Services.  *Id.*  However, by September of 2012 the Debtor had only exchanged proposals with certain MVPDs and had not signed any major affiliation agreements other than the preexisting deal with Comcast Cable.  *Id.*

According to the complaint, employees of NBCU recommended in November of 2012 that the Debtor make a proposal to a major MVPD at rates significantly below those called for in the business plan.  *Id.* at 16.  Because these lower rates were unsustainable pursuant to the business model, the Astros requested that Comcast Services/NBCU formulate an alternate business plan to address the reality of reduced carriage.  When no such business plan was forthcoming, the Astros opposed the NBCU proposal, reasoning that the Debtor should not enter into a major deal with an MVPD until a new business plan had been formulated.  *Id.*  The Astros made repeated requests to Comcast Services to formulate a new business plan, but these requests remained unaddressed.  Ogle alleges that Comcast Services' decision to reject the Astros' request was not made in good faith and was in violation of the Services Agreement § 2.2(e).  *Id.* at 17.

By the spring of 2013, the Debtor had still not entered into any additional affiliation agreements and was experiencing large negative cash flows.  *Id.*

Ogle alleges that the Debtor's failure to reach any new affiliation agreements was particularly noteworthy given that, in January of 2013, Comcast entered into a global deal with Suddenlink that incorporated every network in Comcast's portfolio except for CSN Houston.  *Id.* at 18.  The complaint alleges that Comcast never mentioned a potential Suddenlink deal to the board of directors and that the Debtor did not find out about the deal until after the fact.  *Id.* According to the complaint, the reason Comcast failed to utilize its significant bargaining power in order to incorporate CSN Houston into the Suddenlink deal was because Comcast only owned a 22.5% stake in the Debtor.  *Id.* at 19.

Failure to reach agreements with new MVPDs would allegedly benefit Comcast because the value of the revenue-starved Debtor would be driven down and Comcast could then acquire the Astros' and Rockets' stake at a reduced price.  *Id.*  Ogle further alleges that by treating the Debtor differently than Comcast's wholly owned regional sports networks, Comcast Services and NBCU acted contrary to the Services Agreement.  Section 2.4 of the Services Agreement states, in pertinent part:

> (b) Comcast shall devote such time, personnel and resources as are reasonably necessary to, and shall, ensure the proper, timely and efficient provision of such Services to Network in a manner that is, under the circumstances, at a minimum, consistent in all material respects with . . . (iii) **the same highest level and quality of service that Comcast uses when providing similar service to any other Comcast-Related RSN** [regional sports network]. . .

> (c) In providing the Services, in general, Comcast shall allocate its time, personnel and resources equitably and fairly as between the Network and all other Comcast-Related RSNs based on the totality of the circumstances and shall not base such allocation of time, personnel and resources on **the amount or nature of any Comcast Party's ownership interest in such Comcast-Related RSN.**

(d) With respect to bulk purchases of products or services made by Comcast from non-Affiliate third-parties on behalf of Comcast-Related RSNs negotiated primarily on the total volume of all participating Comcast-Related RSNs, Comcast agrees that it shall not discriminate against the Network in negotiating the pricing, benefits and other terms available to Network under such agreements. With respect to all other purchases of products or services from non-Affiliate third-parties negotiated by Comcast on Network's behalf, Comcast shall **use commercially reasonable efforts to obtain for Network the best pricing, benefits and other terms available to Network under the circumstances. . . .**

(ECF No. 1-1 at 5-6) (emphasis added).

At a May 8, 2012, board meeting, the Rockets' director questioned Comcast about its failure to use its leverage to obtain carriage for CSN Houston through NBCU global distribution deals.  (ECF No. 1 at 20).  Jon Litner, the President of Comcast Services and one of Comcast's representatives on the board, responded that CSN Houston had not been included in recent global distribution discussions because it was not in the Debtor's best interest due to timing concerns.  *Id.*  Ogle alleges that the Debtor was never consulted about this decision and that Comcast unilaterally decided what was in the Debtor's best interest.

In April of 2013, realizing the Debtor's liquidity constraints, the Astros and Rockets reached out to Comcast to sell their entire stake based on the original implied enterprise value of the Debtor ($700 million).  *Id.*  Comcast refused, allegedly because it wanted to drive the price down further.  On May 17, 2013, Robert Pick, Senior Vice President of Corporate Development at Comcast Corp. and Comcast Partner and Senior Vice President of Comcast Lender, emailed Astros and Rockets officials the terms of a debt restructuring proposal.  *Id.* at 21.  Pick repeated the proposal that the Debtor enter into an affiliation agreement with a major MVPD at rates below those suggested in the business plan as well as proposing changes to the Debtor's governance which would increase Comcast's control over the Debtor.  *Id.*  Both the Astros and Rockets rejected the proposal.

The Debtor's liquidity situation continued to worsen as 2013 progressed.  On May 31, 2013, the Debtor exhausted its $100 million line of credit with Comcast Lender and was forced to issue a capital call.  *Id.*  The Debtor issued another capital call in June to satisfy its media rights payment to the Astros.  Despite these measures, the Debtor was unable to make its July media rights payment to the Astros.  *Id.*  The Astros immediately notified the Debtor that its failure to make a required payment was an Event of Default pursuant to the Media Rights Agreement.  *Id.*  Under the terms of the Media Rights Agreement, the Debtor had until September 30, 2013 to cure the default.  The Debtor subsequently failed to make its next monthly payment on August 31, 2013.  *Id.*

Reacting to the Debtor's deteriorating situation, Comcast Partner met with Astros Partner and Rockets Partner on August 5, 2013, and proposed a buyout of the Astros' 46.5% interest in the Debtor for approximately $185 million.  *Id.* at 22.  After purchasing the Astros' stake, Comcast would have owned just under 69% of the Debtor.  Rockets Partner, who had a contractual right to approve or veto the Astros' sale of its equity, requested the same deal from Comcast Partner based on the same valuation.  *Id.*  Comcast Partner refused and Rockets Partner subsequently withheld consent.  *Id.*

*The Involuntary Bankruptcy*

The Debtor's LP Agreement required unanimous consent of the directors for the Debtor to file a bankruptcy petition.  *Id.*  Anticipating that either the Astros or the Rockets would not support a voluntary bankruptcy, Comcast approached the Rockets in September of 2013 and asked if the Rockets would join Comcast as a petitioning creditor.  *Id.* at 2013.  Per the complaint, the Rockets told Comcast that the Rockets would be willing to support the involuntary bankruptcy but *only if* Comcast committed to making a stalking horse bid in an

amount equal to the valuation Comcast used when it had made the August, 5, 2013, offer to the Astros.  *Id.*  Initially, counsel for Comcast indicated that Comcast was not willing to commit to a stalking horse bid at these terms because it thought bankruptcy would negatively impact the Debtor's value.  *Id.*

On September 27, 2013, Comcast Services, Comcast Lender, Comcast SportsNet California, LLC, and National Digital Television Center, LLC (collectively, the "Comcast Petitioning Creditors") filed an involuntary chapter 11 petition against the Debtor.  (Case No. 13-35998; ECF No. 1).  The next day, Comcast filed a motion to appoint a Chapter 11 trustee.  (Case No. 13-25998; ECF No. 3).  In the motion, Comcast expressed its interest in acquiring the assets of the Debtor at a price that would result in a material distribution for the limited partners and the general partner.  *Id.*  To wit:

> The Network does have assets—including the right to telecast Astros and Rockets games, the right to receive monthly fees under an affiliation agreement with [Comcast Cable] for distribution of the Network's Services, and rights to receive revenue from a few smaller operators that carry the Service.  These assets have significant value, the protection of which is the central purpose of this involuntary bankruptcy filing.
>
> [Comcast Lender] . . . believes the Network's assets have meaningful value, and *would be prepared to make a bid to acquire either the Network (under a plan of reorganization) or substantially all of its assets*.  Comcast Lender believes that such a transaction—*if it were to close by the end of the calendar year . . .* —would likely lead to prepetition creditors' claims and all reasonably foreseeable administrative expenses being paid in full, and a material distribution to equity holders.

(*Id.* at 4) (emphasis added).  Counsel for Comcast reiterated this statement before the Court at the September 30, 2013, first-day hearings.  (ECF No. 1 at 24).  Comcast also filed an amended motion to appoint a trustee on October 7, 2013, which repeated its interest in acquiring the Debtor with the same language.  (Case No. 13-5998; ECF No. 60).

The Astros immediately filed a motion to dismiss the involuntary proceeding, arguing, *inter alia*, that the petition was a bad faith attempt by Comcast to acquire the Debtor in order to obtain the rights to broadcast Houston Astros games.  (Case No. 13-35998; ECF No. 64 at 7).  Comcast responded by reiterating its intention to bid on the Debtor's assets.  (ECF No. 1 at 25).  Finally, in a reply brief supporting its motion to appoint a trustee, Comcast repeated: "[a]ll that Comcast Lender has stated is that it would be willing to make a bid in bankruptcy for the Network or substantially all of its assets as part of an open auction process, and that such an acquisition would likely lead to full payment of creditors' claims."  (Case No. 13-35998; ECF No. 116 at 6) (emphasis omitted).

Meanwhile, the Rockets[4] filed a statement on October 21, 2013, opposing the appointment of a trustee but supporting the entry of an order for relief under chapter 11.  Ogle alleges that the Rockets support of the involuntary petition was based entirely on the Comcast Petitioning Creditors' repeated statements that Comcast Lender would bid on the Debtor in an amount sufficient to pay all creditors and provide a material distribution to equity holders.  (ECF No. 1 at 26).  On October 24, 2013, the Debtor's landlord, HP Fannin Properties, LP ("HP Fannin") also filed a statement in support of the involuntary petition.  *Id.*  The complaint alleges that the Rockets asked HP Fannin to support the bankruptcy, and HP Fannin agreed so long as the Rockets filed its support of the petition first.  *Id.*

The Court held a hearing on the Astros' motion to dismiss on October 28, 2013.  Defendant Pick testified at the hearing that Comcast Lender was prepared to bid on the Debtor, and that the bid would be sufficient to "return a significant amount of equity to the partners," if the Debtor were acquired by the end of 2013.  (Case No. 13-35998; ECF No. 140 at 466).  At the

---

[4] Specifically Rocket Ball and Clutch City Sports & Entertainment, L.P., an affiliate of Rocket Ball and the Debtor's landlord for a suite at the Toyota Center.  (ECF No. 1 at 26).

continuation of the hearing on October 29, the Court abated consideration of whether an order for relief should be granted or whether the petition should be dismissed.  The Court issued an order designating the Astros as the lead negotiator for the purposes of restructuring or reorganizing the Debtor, including negotiating new carriage agreements.  (Case No. 13-35998; ECF No. 137).

As lead negotiator, the Astros spoke with various third parties (AT&T, DirecTV, FOX, Dish Network, and Time Warner) regarding a potential restructuring or purchase of the Debtor. (ECF No. 1 at 28).  The complaint alleges that many of these third parties told the Astros they were not interested in getting involved with the Debtor because they knew Comcast would be buying the Debtor out of bankruptcy, making it futile for them to get involved.[5]  *Id.*  FOX affirmatively stated that it would be willing to do a deal with the Debtor on favorable terms if the Debtor were not in bankruptcy.  AT&T and DirecTV also allegedly told the Debtor that the bankruptcy was hurting the Debtor's value.  *Id.*

During the negotiation process, the Astros requested certain documentation and information from Comcast Services and NBCU.  *Id.*  Per § 2.5 of the Services Agreement:

> Comcast acknowledges and agrees that all information relating to Network that is obtained by Comcast in connection with the provision by Comcast of the Services, including any information, analyses, summaries, notes, data and other documents and materials prepared by Comcast containing or reflecting or generated from such information . . . is the property of Network, and Comcast shall promptly provide all such information to Network at the request of Network. . . .

(ECF No. 1-1 at 6).  The Astros requested the information in order to provide it to potential counterparties, but Comcast did not release the information in a timely fashion.  (ECF No. 1 at

---

[5] In addition to Comcast's position as an insider, Comcast Lender would have the ability to credit bid the $100 million it was owed by Debtor, allegedly giving it a strong advantage in any effort to purchase the Debtor.

29).   The complaint alleges that Comcast's failure to release this information obstructed the Astros' ability to successfully negotiate with counterparties.

In late November of 2013, the Astros role as chief negotiator was compromised when, facing an expiring statute of limitations, Astros affiliate HBP filed a state court lawsuit against McLane Champions, LLC, R. Drayton McLane Jr., Comcast Corp., NBCU, and Jon Litner relating to HBP's 2011 purchase of the Houston Astros.  *Id.*  Comcast Corp. and NBCU released a public statement denouncing the lawsuit yet repeating that they "remain[] committed to a reorganization of the Network in Bankruptcy Court."  *Id.*  On January 7, 2014, the Court issued an Amended Negotiations Order replacing the Astros as Debtor's lead negotiator with the Rockets.  (Case No. 13-35998; ECF No. 185).  The Rockets immediately began working with the Astros to continue third-party negotiations the Astros had initiated, particularly a potential deal with DirecTV.  (ECF No. 1 at 29).  Allegedly, the fact that the Debtor was still in bankruptcy continued to have somewhat of a chilling effect on these continued negotiations.  *Id.* at 30.

On January 6, 2014, Defendant Pick sent a letter to the Rockets' director stating the following:

> Comcast's position throughout this matter, beginning with the pleadings it filed for the appointment of a trustee that accompanied the filing of the involuntary petition, has been that it is prepared to make a bid to acquire the Network, thus ensuring that the Network could successfully reorganize in bankruptcy.  *Although the passage of time and other events have affected the valuation*, Comcast[] remains prepared to make a 'stalking horse' bid for the acquisition of the Network.

*Id.* (emphasis added).   Notably, Comcast no longer offered a "substantial" or "material" distribution to equity holders.   The Astros and Rockets, who according to the complaint, considered Comcast's letter as indicative of a good faith intention to make an offer, requested that Comcast provide definite terms of the pending offer.  *Id.* at 30-31.  Comcast did not respond.

On January 10, 2014, Comcast again made a public declaration of its intent to bid on the Debtor in its motion to terminate exclusivity.  (Case No. 13-35998; ECF No. 188).  It stated "Comcast remains prepared to serve as a stalking-horse bidder, and is prepared to acquire the Network, and thus permit the Network successfully to reorganize in bankruptcy."  *Id.*

Shortly thereafter, the Rockets learned that AT&T and DirecTV, while willing to do a deal on the same terms that Comcast had promised, were not willing to exceed Comcast's terms.  (ECF No. 1 at 31).  The Rockets had previously made clear to AT&T and DirecTV that any potential deal with them would have to exceed what had been publicly offered by Comcast because of the added expense and hassle caused by the transition to a new brand owner.  *Id.* Given AT&T and DirecTV's refusal to exceed Comcast's terms, the Rockets withdrew from the negotiations and, on February 4, 2014, the Rockets advised the Court that the only offer remaining was Comcast's.  *Id.* at 32.

*The Order for Relief*

At the February 4, 2014 hearing on the Astros' motion to dismiss, the Court issued an Order for Relief against the Debtor under Chapter 11.  (Case No. 13-35998; ECF No. 210).  On February 12, 2014, the Court issued a Memorandum Opinion setting forth its written findings of fact and conclusions of law relating to the Order for Relief.  (Case No. 13-35998; ECF No. 238). In it, the Court found that only two of the four Comcast Petitioning Creditors (Comcast Services and Comcast Lender) properly qualified as petitioning creditors per 11 U.S.C. § 303.  *Id.* at 6-7. Because a § 303 involuntary petition requires three valid petitioning creditors, the involuntary petition would have been dismissed if not for the Rockets Petitioning Creditors and HP Fannin joining the petition.  The complaint alleges that, if not for Comcast's repeated assurances that it

was prepared to make a stalking horse bid, the Rockets (and consequently HP Fannin) *would not* have supported Comcast's efforts to put the Debtor into bankruptcy. (ECF No. 1 at 33).

Ogle also alleges that Comcast's representations regarding the stalking horse bid prevented the Debtor itself from challenging the involuntary petition. *Id.* In announcing oral findings at the February 4 hearing, the Court stated "[u]nder Section 303 the Court is required to grant relief to an involuntary petition unless it is timely contested by the Debtor. There has been no timely contest by the Debtor." (Case No. 13-35998; ECF No. 213 at 165). The reason that the Debtor did not contest the involuntary petition was because of the LLC Agreement, which required an affirmative vote of the majority of directors entitled to vote in order for the Debtor to file a motion to dismiss the petition. (ECF No. 1 at 33). As representatives of the party who initiated the involuntary proceeding, the Comcast directors were allegedly conflicted as defined by the partnership agreement and accordingly not entitled to vote. This left two directors able to vote on whether to contest the petition: the Astros director and the Rockets director. Because the Rockets director supported the petition—and allegedly would not have given it support without Comcast's representations—the Debtor was not able to contest the petition. *Id.* at 34.

*Comcast Reverses Course*

After the Order for Relief was issued, the Rockets and Astros continued to reach out to Comcast for the details of the stalking horse bid. *Id.* Comcast continued to refuse to provide details. It instructed the teams that the Debtor would need to retain its own counsel before Comcast could move any further with the deal. *Id.* However, when the Debtor hired its own bankruptcy counsel on February 25, 2014, Comcast continued to stall. *Id.*

During this time period, Madison Bond, an employee of Comcast Services/NBCU, engaged in confidential discussions with DirecTV and AT&T regarding potential carriage of

CSN Houston.  *Id.*  DirecTV informed Bond that the Debtor's asking price was ten times too high and that they would not pay anywhere near what the Debtor was asking for carriage.  *Id.* Ogle alleges that the information Bond learned from DirecTV was property of the Debtor pursuant to the Services Agreement and that Comcast was required to provide this information to the Debtor.  *See* Comcast Services Agreement § 2.5, *supra*.  Bond did not inform the Debtor or the Rockets and Astros' board members about his discussions with DirecTV.  (ECF No. 1 at 34). He did, however, allegedly speak to Comcast's representatives on the board of directors, Ruth and Litner, about his DirecTV discussions.  Ruth and Litner then passed this information along to Comcast Lender but did not inform their fellow board members.  *Id.* at 35.

According to Ogle,  the reason for Comcast's reluctance to provide definite terms for its stalking horse bid became clear when it filed with the Court a Notice of Comcast's Determination that it Will Not Bid to Acquire the Network.  This was filed on March 17, 2014 (Case No. 13-35998; ECF No. 326).  The Notice stated:

> Comcast initiated this bankruptcy proceeding in the belief that the chapter 11 process would permit the Network to reorganize, thus preserving the Network's value and the jobs of many employees.  Much has happened, however, in the nearly six months since this involuntary case was filed.  In view of these developments, Comcast is no longer prepared to purchase the Network.
>
> Comcast remains open to considering any proposal by the Debtor for reorganizing the Network successfully in chapter 11, including through an auction or through further efforts to obtain additional carriage.

*Id.*  In contrast to previous Comcast court filings throughout the bankruptcy which had been filed under seal, the Notice was filed publicly.  As a result, the Houston Chronicle, Houston's leading newspaper, ran an article the next day titled "Comcast Won't Purchase Struggling CSN."  (ECF No. 1-2).  The article, which quoted the Notice in its entirety, opened with the following: "Comcast said Monday it will not enter a bid to purchase Comcast SportsNet Houston out of

Chapter 11 bankruptcy, throwing more uncertainty into the 5-month-old saga over the future of the Astros-Rockets-Comcast partnership." *Id.*

The complaint alleges that, despite what Comcast stated in the Notice, there had been no material change in the Debtor's finances or circumstances between February 4, when Comcast publicly reiterated its intention to bid on the Debtor, and the filing of the Notice on March 17.[6] (ECF No. 1 at 35). Rather than changing its mind due to market forces, Ogle alleges that Comcast always intended to publically withdraw its offer in order to drive down the Debtor's value. In effect, Ogle alleges that the true purpose of the Notice was to chill outside interest in the Debtor, forcing the Debtor to sell itself to Comcast at a significant discount.

Knowing that Comcast would no longer bid on the Debtor at the previously offered price, the Astros and Rockets immediately began to search for new purchasers. *Id.* at 36. In connection with this search, in April of 2014 Debtor's counsel requested that Comcast Services provide details about what it had done to obtain carriage for the Debtor since the Petition Date. *Id.* At an April 10, 2014, board meeting, Ruth and Litner did not divulge the fact that Bond had held previous discussions with DirecTV when asked to provide details of Comcast's attempts to obtain carriage. *Id.* at 37. Finally, at a second board meeting held on April 15, Bond presented to the directors an update on the current carriage market conditions and informed the Rockets' and Astros' directors for the first time of his DirecTV discussions. *Id.*

---

[6] This does not appear to be an "after the fact" view alleged merely to support this lawsuit. The General Counsel for the Astros, when asked to comment on the Notice for the Houston Chronicle article, stated: "Comcast drove the network into bankruptcy for the stated purpose of preventing us from terminating our media rights agreement and to buy the network out of bankruptcy. Now . . . they are pulling out. Market conditions haven't changed, Comcast's tactics have." (ECF No. 1-2).

While the teams conducted negotiations with outside parties, particularly AT&T and DirecTV,[7] Comcast continued to actively pursue a purchase of the Debtor or substantially all of its assets. *Id.* In late May or early June of 2014, counsel for Comcast placed a telephone call to Astros' and Rockets' representatives. On that call, Comcast proposed an offer that was significantly less than Comcast had previously indicated it was prepared to offer. *Id.* The Rockets agreed to consider the offer and Comcast sent a revised term sheet to the teams on June 2, 2014. *Id.* at 38. Comcast's new offer would not have paid creditors in full and accordingly would have provided no contributions to the equity holders. *Id.* Comcast's proposal also required the Rockets and Astros to agree to significant cuts in future media rights payments, a condition which the teams viewed as a nonstarter. *Id.* At a board meeting on June 3, the Rockets director agreed to consider the Comcast offer but also noted that the teams continued to hold discussions with DirecTV and AT&T. *Id.*

Ultimately, the Astros and Rockets were able to reach a deal with DirecTV and AT&T (the "DTV/AT&T Deal"). The Astros and Rockets each entered new affiliation agreements and Direct TV and AT&T collectively received 100% of the equity interests in the Reorganized Debtor. *Id.* The DTV/AT&T Deal was incorporated into a plan of reorganization which the board of directors unanimously approved. On October 30, 2014, the Court approved the plan over Comcast's objection. *Id.* at 39. The plan's Effective Date was November 17, 2014.

Although the Debtor was ultimately able to find a purchaser—and consequently, Comcast did not acquire the Debtor at a steep discount—the complaint alleges that Comcast's conduct damaged the Debtor in several ways. First, the eventual DTV/AT&T Deal provided essentially

---

[7] AT&T announced its intent to merge with DirecTV on May 18, 2014. Believing the merger announcement would have changed AT&T's or DirecTV's view on purchasing the Debtor, the Astros immediately reached out to AT&T and AT&T expressed an interest. (ECF No. 1 at 38).

nothing for the unsecured creditors and equity holders, pending the resolution of this lawsuit.[8]
Ogle alleges that the DTV/AT&T Deal provided less value than if the Debtor had simply
liquidated in September of 2013.  The Debtor could have also done a deal with DirecTV and
AT&T in February of 2014 at the same terms promised by Comcast (which at that point in time
meant unsecured creditors would have been paid in full) but the teams rejected that deal,
preferring to remain in business with Comcast.  Second, the complaint alleges that the Debtor
was damaged by Comcast's withholding of the information regarding its discussions with
DirecTV, because that information would have been helpful in the determination of whether to
pursue potential restructuring opportunities with Comcast or with other third parties.  (ECF No. 1
at 44).  Finally, by making a public statement in the bankruptcy case that it was no longer
interested in purchasing the Debtor, Comcast chilled interest from third parties and harmed the
Debtor's value.

## Procedural Posture

Ogle commenced this adversary proceeding on June 11, 2015.  (ECF No. 1).  The
complaint named Comcast Corp., Comcast Services, Comcast Lender, Comcast Cable, Comcast
Partner, National Digital Television Center, LLC, Comcast California, NBCU, Jon Litner, John
Ruth, Robert Pick, and Madison Bond as Defendants.  The complaint alleges nine causes of
action: fraudulent misrepresentation, fraud by nondisclosure, business disparagement, tortious
interference with prospective business relations, promissory estoppel, breach of fiduciary duty,
breach of contract, aiding and abetting, and conspiracy.  It also alleges various theories of
liability such as vicarious liability and piercing the corporate veil.  On July 29, 2015, the Court

---

[8] The plan of reorganization created the HRSN Litigation Trust, which owns certain transferred causes of action of
the Debtor, including all of the causes of action asserted in this adversary proceeding.  (Case No. 13-35998; ECF
No. 772 at 11-12).  The claims of unsecured creditors and the equity holders are only paid through the HRSN
Litigation Trust's successful recoveries, if any.  *Id.* at 6.

approved a joint motion setting deadlines for filing a motion to dismiss as well as Ogle's response.  (ECF No. 6).  The Comcast Defendants filed their motion to dismiss on September 4, 2015.  (ECF No. 8).  Following the conclusion of a December 17, 2015 hearing on the motion to dismiss, the Court took the matter under advisement.

### Jurisdiction and Authority

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1334(b).  Section 1334 provides that district courts have subject matter jurisdiction over all "civil proceedings arising under title 11, or arising in or related to cases under title 11."  The Fifth Circuit has held that, with respect to bankruptcy cases which remain open, "it is not necessary to distinguish between proceedings 'arising under,' 'arising in a case under', or 'related to a case under title 11.'"  *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987).  Consequently, bankruptcy courts need only determine whether a matter is at least related to the bankruptcy.  *Bass v. Denney (In re Bass)*, 1017 F.3d 1016, 1022 (5th Cir. 1999).  An adversary proceeding falls within the court's "related to" jurisdiction if "the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy."  *Wood*, 825 F.2d at 93.

Although the Third Amended Plan of Reorganization, confirmed by this Court on October 30, 2014, contains a broad retention-of-jurisdiction provision, the source of subject-matter jurisdiction is 28 U.S.C. § 1334, not the express terms of a confirmed plan.  *U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 303 (5th Cir. 2002).  However, § 1334 does not expressly limit bankruptcy jurisdiction upon plan confirmation.  *Id.* at 304.  Post-confirmation subject-matter jurisdiction exists over "matters pertaining to the implementation or execution of the plan."  *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex.)*, 266 F.3d 388, 390 (5th Cir. 2001).

In a case involving a litigation trust established pursuant to a confirmed plan, the trusts "by their nature maintain a connection to the bankruptcy even after the plan has been confirmed" because they often play a central role in the implementation of the plan. *Binder v. Price Waterhouse & Co. (In re Resorts Intern., Inc.)*, 372 F.3d 154, 167 (3d Cir. 2004). To avoid the prospect of "unending jurisdiction," litigation trusts must maintain a close nexus to the bankruptcy case to satisfy jurisdictional requirements. *Id.* "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id.* Given that the causes of action presented in this lawsuit occurred prior to confirmation, to a large extent involve conduct occurring *during the bankruptcy case itself*, and any recovery from this lawsuit will be distributed on a pro rata basis to three classes of creditors pursuant to the plan of reorganization, the Court finds that such a "close nexus" exists. *See Astropower Liquidating Trust v. Xantrex Tech., Inc.*, 335 B.R. 309, 323 (Bankr. D. Del. 2005) (finding that post-confirmation jurisdiction existed where the causes of action pursued by a liquidation trust were "both logically linked to the Debtor's prepetition losses, and entrusted to the Plaintiff *via the Plan for the benefit of creditors*") (emphasis in original). Accordingly, this Court possess subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b).

Although subject matter jurisdiction is proper in this Court, questions regarding the constitutional authority of an Article I bankruptcy judge must be addressed. Under *Stern v. Marshall*, the question of whether a bankruptcy judge may enter a final judgment in a case depends on whether the cause of action stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process. 131 S.Ct. 2594, 2618 (2011). Given that the causes of action presented in this adversary proceeding are state law claims and do not involve a claim

against the bankruptcy estate, it is likely that the Court would not possess *Stern* authority. However, although the Comcast Defendants have not consented to a jury trial in bankruptcy court, they have consented to this Court ruling on dispositive motions.[9]  Even when a case does create a *Stern* problem, Article III will be satisfied where the parties knowingly and voluntarily consent to the bankruptcy court's power to issue final judgments.  *Wellness Int'l Network v. Sharif*, 135 S.Ct. 1932, 1938-39 (2015).  Furthermore, even where the parties do not consent, the Court may still issue interlocutory orders in proceedings in which the Court does not have authority to issue a final judgment.  *Trevino v. HSBC Mortg. Serv. (In re Trevino)*, 535 B.R. 110, 125 (Bankr. S.D. Tex. 2015).  An order dismissing fewer than all of the claims presented in a complaint is interlocutory.  *Id.* at 126.

### Rule 12(b)(6) Standard

The Court reviews motions under Rule 12(b)(6) by "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to plaintiffs."  *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007) (per curiam).  However, the Court "will not strain to find inferences favorable to the plaintiff."  *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (internal quotations omitted).

To avoid dismissal for failure to state a claim, a plaintiff must meet Fed. R. Civ. P. 8(a)(2)'s pleading requirements.  Rule 8(a)(2) requires a plaintiff to plead a "short and plain statement of the claim showing that the pleader is entitled to relief."  In *Ashcroft v. Iqbal*, the Supreme Court held that Rule 8(a)(2) requires that the "well-pleaded facts" must "permit the court to infer more than the mere possibility of misconduct."  556 U.S. 662, 679 (2009) (quoting Rule 8(a)(2)).  "Only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "[A] complaint

---

[9] Plaintiff has also consented to this Court issuing a final order in the adversary proceeding.  (ECF No. 1 at 9).

does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (internal quotations omitted).

## Analysis

### I.  General Defenses

As a threshold matter, the Comcast Defendants have raised two general defenses which the Court will address before turning to the arguments against specific counts of the complaint.

*The Comcast Defendants Have Not Provided an Obvious Alternative Explanation*

As discussed above, a complaint must state a *plausible*, as to opposed to merely *possible*, claim for relief.  It is not enough to plead facts that are merely consistent with the defendant's liability; if the alleged facts are subject to an "obvious alternative explanation" under which the defendant would not be liable, dismissal is required.  *See Aschroft v. Iqbal*, 556 U.S. 662, 678, 682 (2009).  The Comcast Defendants have provided an alternative explanation which they deem obvious, i.e., that Comcast originally had every intention to purchase the Debtor out of bankruptcy but was forced to alter course in light of its deteriorating business relationship with the teams.

Before addressing Comcast's explanation itself, it would be helpful to parse out exactly what is meant by an "obvious alternative explanation."  The term has not been defined by the Supreme Court.  *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 n. 5 (2d Cir. 2013).  Nor is there substantial case law from the Fifth Circuit.  However, the Sixth Circuit has considered the phrase in great detail.  *16630 Southfield L.P. v, Flagstar Bank, F.S.B.*, 727 F.3d 502, 504-06 (6th Cir. 2013).

The plausibility of a complaint depends on several considerations, including "common sense and the strength of competing explanations for the defendant's conduct." *Id.* (citing *Iqbal*, 556 U.S. at 682). But the mere existence of more likely alternative explanations does not automatically entitle a defendant to dismissal. *Southfield*, 727 F.3d at 505. "[I]f a plaintiff's claim is plausible, the availability of other explanations—*even more likely explanations*—does not bar the door to discovery." *Id.* (emphasis added). Indeed, weighing the likelihoods of competing theories regarding the defendant's conduct is not appropriate at the pleadings stage. *Id.* (citing *Watson Carpet & Floor Covering, Inc. v. Mowhawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011)). At the same time, the plausibility of a complaint cannot be judged in a vacuum and the reasonableness of the inference sought must be addressed. *Southfield*, 727 F.3d at 505.

In *Southfield*, plaintiff 16630 Southfield L.P.—a partnership set up by Danou, a naturalized U.S. citizen hailing from Iraq—had borrowed $13 million from Flagstar Bank secured by several parcels of real estate. *Id.* at 503. After Southfield failed to pay the loan as it came due in 2009, it reached a restructuring agreement with Flagstar by which it agreed to repay the $6.5 million balance in November of 2012. *Id.* In 2011, Flagstar, which had classified the Southfield loan as a "troubled asset," began investigating Southfield's financial condition further. *Id.* Following the investigation, Flagstar told Danou in no uncertain terms that it would never consider a second extension of the loan. *Id.* At the time, Southfield was current on all of its restructured loan obligations. When Danou requested a second extension in 2012, Flagstar promptly denied the request even though Danou had offered additional collateral and his wife's guarantee. *Id.* Danou and Southfield then sued Flagstar for violation of the Equal Credit Opportunity Act by discriminating against them on account of Danou's Iraqi origin.

The plaintiffs alleged on information and belief that Flagstar had refinanced delinquent borrowers who were white and had worse debt-to-equity ratios than Danou. *Id.* at 506. However, the complaint failed to identify any such individuals and merely rested on the plaintiffs' belief that such people existed. *Id.* In effect, the complaint asked the court to ignore the fact that Southfield failed to repay its original loan on time and a Flagstar employee tasked with investigating Southfield's finances strongly recommended against a second extension. "Common sense suggests that Flagstar denied Southfield's request for a further extension because it thought the extension was a bad business proposition, not because it wanted to discriminate against people of Iraqi origin." *Id.* at 505. Faced with Flagstar's obvious alternative explanation, the Sixth Circuit affirmed the lower court's dismissal.

*Aschroft v. Iqbal* also involved a discrimination lawsuit, specifically a Pakistani citizen who was arrested in the United States after September 11, 2001, on terrorism charges. 556 U.S. 662, 666 (2009). Iqbal, who was Muslim, had been arrested in November of 2011 for fraud in relation to identification documents. *Id.* at 667. While in custody, he was designated as a "person of high interest" by the FBI and was placed in a special maximum security prison. *Id.* In his complaint, he alleged he was beaten repeatedly and dragged across his cell for no reason. After he was convicted of the original fraud count, Iqbal was deported to Pakistan and filed a complaint against his correctional officers, the wardens of various prisons, former FBI Director Mueller, and former Attorney General Ashcroft. *Id.* The allegations against Ashcroft and Mueller were that they designated Iqbal a person of high interest because of his religion and nationality and placed him in a maximum security prison due to his background. *Id.* at 669.

In reversing the lower courts' denial of Ashcroft's and Mueller's motion to dismiss, the Supreme Court noted that, if taken as true, the complaint's allegations that Ashcroft and Mueller

orchestrated a policy which resulted in the detainer of thousands of Arab Muslim men was

'consistent' with discrimination based on race, religion, or national origin. *Id.* at 682. However,

given that this policy was subject to an obvious alternative explanation, the Court found that the

complaint was not plausible:

> The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who
> counted themselves members in good standing of al Qaeda. . . . Al Qaeda was
> headed by another Arab Muslim . . . and composed in large part of his Arab
> Muslim disciples. It should come as no surprise that a legitimate policy directing
> law enforcement to arrest and detain individuals because of their suspected link to
> the attacks would produce a disparate, incidental impact on Arab Muslims, even
> though the purpose of the policy was to target neither Arabs nor Muslims. . . . As
> between that "obvious alternative explanation" for the arrests, and the purposeful,
> invidious discrimination respondent asks us to infer, discrimination is not a
> plausible conclusion.

*Id.* (internal citations omitted). In other words, the plaintiff's complaint may only be dismissed

in light of an "obvious alternative explanation" when the defendant's explanation is *so*

*convincing* that the plaintiff's explanation is rendered implausible. *See Starr v. Baca*, 652 F.3d

1202, 1216 (9th Cir. 2011).

Turning to the case at issue, Comcast's proposed obvious alternative explanation is as

follows:

> (1) Before the bankruptcy, Comcast, consistent with its substantial economic
> investment in the Debtor, was trying to help the Debtor move past the governance
> deadlock so that it could be economically viable, and (2) as the bankruptcy
> proceedings moved forward, no progress was made, and relations among the
> parties deteriorated—including because the Astros sued Comcast for fraud—
> *Comcast's thinking changed*. When, as a result of those and other changes
> relevant to Comcast, the truthful statements Comcast had made at the outset about
> its intentions no longer reflected its intentions (after a substantial lapse of time),
> Comcast promptly informed the Court.

(ECF No. 8 at 33-34) (emphasis added). Comcast posits that this explanation avoids several of

the inconsistencies that allegedly plague Ogle's complaint. Specifically, Comcast questions

why, after allegedly engaging in "months if not years of machinations to acquire the Debtor's

assets on the cheap," Comcast *never actually purchased the Network*.  The complaint alleges that Comcast succeeded in tanking the value of the Debtor, but when presented with a golden opportunity to buy the Debtor out of bankruptcy, Comcast apparently balked.

The second major inconsistency Comcast points to is that Ogle is attempting to have it both ways when it discusses the reactions of various MVPD's to Comcast's conducts. According to the complaint, when Comcast originally announced its intention to make a stalking horse bid, "many of these third parties told the Astros that they were not interested in getting involved in the Debtor's bankruptcy case, and, more importantly, that it was their understanding that Comcast would be buying the Debtor out of bankruptcy, so it would be futile for them to get involved."  (ECF No. 1 at 28).  According to this logic, it would stand to reason that Comcast's sudden withdrawal may have enticed third parties to enter the fray.  But the complaint alleges that the exact opposite happened.  "Put simply, the trustee alleges both that Comcast drove others away by expressing interest in the Network, and then drove others away by expressing no interest in the Network."  (ECF No. 8 at 32) (internal citations omitted).

Similarly, Comcast argues that Ogle's theory of recovery rests on the generally implausible premise that third parties would blindly react to Comcast's March 17, 2014, Notice and not perform their own due diligence.  (ECF No. 19 at 12).  Comcast questions how this could be when the complaint appears to argue that third parties *did not* blindly credit Comcast's earlier statements of intent and become more interested in the Debtor.  "[I]f the trustee's argument is that Comcast's earlier expressions of interest would drive competitors away because they would see Comcast as having the inside track on any bidding, then he must accept that Comcast's later withdrawal would open the field and thus . . . attract competitors."  *Id.* at 14.

Finally, Comcast argues that Ogle's complaint is inconsistent in that it alleges that Comcast's allegedly false promises cost the Debtor an opportunity to do a more lucrative deal with DirecTV and AT&T "on the same terms proposed by Comcast." *Id.* at 16. But the complaint consistently alleges that Comcast's promises were not genuine and actually part of its grander scheme to drive the Debtor's value down. Comcast argues that Ogle cannot rely on Comcast's promises as a genuine offer which the Debtor lost because of the bankruptcy, yet at the same time argue that these "offers" were merely illusory.

The Court does not view Ogle's complaint as inconsistent. It stands to reason that when Comcast—one of the largest corporations in America and the Debtor's business associate dating back to 2010—put the Debtor into bankruptcy and announced its intention to make a bid, other MVPD's believed Comcast had the inside track to purchase the Debtor and it would be futile for them to get involved. In addition, Comcast makes much of the allegation that it was Comcast's intention to bid on the Debtor that drove competitors away and its supposed inconsistency, but the complaint actually alleges it was Comcast's presence *combined with* the bankruptcy itself that caused a chilling effect. (ECF No. 1 at 55) ("For example, FOX expressed its reluctance to become involved in the Debtor's bankruptcy proceedings. But FOX also affirmatively stated it would be willing to do a deal with better terms for the Debtor if the Debtor was not in bankruptcy.").

Nor is it hard to imagine how Comcast's withdrawal of its intention to bid on the Debtor would have impacted the value of the Debtor. Comcast is a major industry player, and perhaps more importantly, would have had access to inside information on the true financial condition of the Debtor. When Comcast announced it was not going to bid on the Debtor, it would have sent a clear signal to competitors that the Debtor was not worth what Comcast previously estimated,

regardless of their ability to perform due diligence. This is not the time to determine whether Comcast withdrew its offer because it actually believed it was a bad business deal or because it was attempting to drive the Debtor's value down. The complaint alleges that Comcast's conduct was part of a fraudulent scheme, and the alternative explanation offered by Comcast is not so convincing as to make the complaint implausible.

Comcast's belief that its failure to ultimately acquire the Debtor makes the complaint "wholly implausible" is similarly misplaced. According to Comcast, "[t]he trustee's theory, then, is that Comcast invested significant resources in an elaborate plan—not only spending money on legal fees, but also driving down the value of its own equity stake in the Debtor during the bankruptcy—only to walk away at the last minute rather than realize the payoff of that plan." (ECF No. 8 at 31). This statement appears to ignore, or at least underplay, the complaint's allegation that "[t]hroughout the spring and early summer of 2014, contrary to the statements made in the Notice, Comcast continued to actively pursue a purchase of the Debtor, or substantially all of its assets." (ECF No. 1 at 37). Indeed, the complaint alleges that Comcast provided a term sheet to the Rockets and Astros on June 2, 2014, for an amount significantly lower than its previous representations.

The complaint does not paint a picture where Comcast mysteriously abandoned its attempt to acquire the Debtor at the last minute. Instead, Comcast was out negotiated by DirecTV and AT&T, newly motivated to purchase the Debtor after their proposed merger on May 18, 2014. According to the complaint, Comcast had every intention to purchase the Debtor at a reduced price but did not anticipate DirecTV and AT&T sweeping in and taking the prize.

As to Comcast's final claimed inconsistency, Comcast is incorrect that Ogle is relying on Comcast's promises as actual offers somehow lost because of the bankruptcy. Rather, Ogle is

claiming the Debtor *relied* on Comcast's representations that it would purchase the Debtor, and this reliance caused the Debtor to suspend negotiations with DirecTV and AT&T on February 3, 2014. DirecTV and AT&T were allegedly willing at that point to match Comcast's terms but the eventual deal was significantly less favorable to the Debtor. With regard to Ogle's fraud claim at least, the complaint is not inconsistent.

*Ogle's Fraud and Promissory Estoppel Claims Are Not Precluded by the Court's Prior Findings*

Comcast argues that Ogle's fraud and promissory estoppel claims must fail because they depend on the relitigation of issues already decided by this Court. This principle, known as collateral estoppel, prevents litigation of an issue when: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision." *Bradberry v. Jefferson Cty.*, 732 F.3d 540, 548 (5th Cir. 2013). In cases such as this which are based upon federal question jurisdiction and involve a prior federal judgment, courts apply federal common law regarding collateral estoppel. *Reimer v. Smith*, 663 F.2d 1316, 1326 (5th Cir. 1981) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Foundation*, 402 U.S. 313, 324 n. 12 (1971)). Although strict mutuality of parties was once a requirement for collateral estoppel, the Supreme Court abandoned this requirement in *Blonder-Tongue Laboratories*. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 (1979). Nevertheless, collateral estoppel may only be applied against parties who have had a prior "full and fair opportunity to litigate their claims." *Id.* at 332. "The requirement that a person against whom the conclusive effect of a judgment is invoked must be a party or a privy to the prior judgment retains its full vigor after *Parklane* and has been repeatedly affirmed by our court." *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 338 (5th Cir. 1982).

Comcast argues that this Court's previous findings that (1) the petition was not filed in bad faith, (2) the petition's purpose was to preserve value and give a meaningful opportunity for the Debtor to reorganize, and (3) the Debtor would have failed if the petition was not filed, have met the elements for collateral estoppel.  *See In re Hous. Reg'l Sports Network, LP*, 505 B.R. 468, 478-79 (Bankr. S.D. Tex. 2014).  In that opinion, the Court noted first that because three petitioning creditors—HP Fannin, Clutch City, and Rocket Ball—unquestionably acted in good faith, the involuntary petition must also be considered a good faith filing.  *Id.* at 477.  The Court then, "for the purpose of completeness," considered whether the Comcast Petitioning Creditors acted in good faith.  *Id.*  Although the Court considered the issue to be a close call, it ultimately determined that the Comcast Petitioning Creditors did act in good faith.  It stated:

> The evidentiary record demonstrates what would have occurred if an involuntary petition had not been filed.  In that instance, the Astros would have (quite properly) terminated the Network's rights under the Media Rights Agreement. The Network would have had continuing losses, and no meaningful opportunity to become profitable.  The Network would have failed, and Comcast Lender and Comcast Services would not have been repaid.

*Id.* at 478.

Comcast's estoppel argument fails for two reasons.  First, Comcast has not satisfied the identical issues requirement.  Although Comcast is correct that collateral estoppel may apply in the context of two different claims, the issues must nevertheless be "incontrovertibly identical." *See Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 572-73 (5th Cir. 2005).  Comcast argues that Ogle's claims flow from the premise that Comcast filed a bad-faith petition in order to drive down the price of the Debtor, which cannot be because the Court already determined that Comcast filed the petition in good faith to preserve value.  But in making that decision, the Court was presented with evidence demonstrating that the Astros were prepared to terminate the Media Rights Agreement, that the Debtor could not file bankruptcy voluntarily absent

unanimous consent of the directors, and that Comcast Services and Comcast Lender would not be repaid outside bankruptcy. *Hous. Reg'l*, 505 B.R. at 478-79.

Notably absent from this decision was any mention of Comcast's stalking horse bid. If Ogle's complaint actually alleged that Comcast filed a bad-faith involuntary petition in order to drive down the value of the Debtor, the identical issues requirement would have been met. In reality, however, it was Comcast's *representations* that it intended to place a stalking horse bid and its subsequent reversal of course which are at the heart of Ogle's fraud and promissory estoppel claims, not the bankruptcy petition itself. The issue of whether Comcast had any intention of actually making a stalking horse bid when it made its representations was not decided in the good-faith opinion. Indeed, Comcast did not even announce its intention not to make a bid on the Debtor until March 17, 2014, more than a month after the Court ruled on good faith.

Even if the claims were identical, collateral estoppel would still not be appropriate. Comment i to the Restatement (Second) of Judgments § 27 sets forth the general rule that "[i]f a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." The Fifth Circuit has also stated that "it has always been the rule that although an issue was fully litigated and a finding made on the issue of prior litigation, the prior judgment will not act as collateral estoppel as to the issue if the issue was not necessary to the rendering of the prior judgment. . . ." *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1168 (5th Cir. 1981). Ultimately, the *Hicks* court refused to apply collateral estoppel to a decision resting on alternative grounds in cases of offensive collateral estoppel, but stopped short of applying the rule in all situations. *Id.* at 1169-70.

Comment i to the Restatement is predicated on two basic policy considerations. First, an alternative basis may not be as rigorously considered as a basis necessary to the result. Restatement (Second) of Judgments § 27 cmt. i. Second, the losing party, although entitled to appeal from both determinations, might be dissuaded from doing so because of the likelihood that at least one of the reasons would be upheld. *Id.* This Court has previously considered collateral estoppel in a similar context in *In re Waco Town Square Partners, L.P.* 2013 WL 1748944 (Bankr. S.D. Tex. Apr. 23, 2013). In that case, the Court applied the rationale of *Hicks* and Comment i to the Restatement and did not apply collateral estoppel to a determination predicated on alternate bases. *Id.* at *3-4. The Court recognized that while Comment i appreciates there may be instances where collateral estoppel could be appropriate because an issue was fully and vigorously litigated, the Restatement nonetheless favors a uniform rule barring collateral estoppel when a decision is based on alternate grounds. *Id.* at *4. As in *Waco*, the Court will not depart from the general rule as set forth by the Restatement and collateral estoppel does not bar Ogle's fraud and promissory estoppel claims.

## II. The Specific Claims

Ogle alleges causes of action for: (i) fraudulent misrepresentation; (ii) fraud by nondisclosure; (iii) business disparagement; (iv) tortious interference with prospective business relations; (v) promissory estoppel; (vi) breach of fiduciary duty; (vii) breach of contract; and (viii) conspiracy. The Court will address these causes of action in turn.

*Fraudulent Misrepresentation*

a. Ogle has properly alleged the requisite scienter for common-law fraud

In Texas, to recover for fraud the plaintiff must show (1) that a material misrepresentation was made; (2) that it was false; (3) that when the speaker made it he knew it

false or made it recklessly without any knowledge of the truth; (4) that he made it with the intention that it should be acted on the party; (5) that the party acted in reliance on it; and (6) resultant damages.[10]  *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex. 1977).  State-law fraud claims are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) which mandates that, "a party must state with particularity the circumstances constituting fraud or mistake."  The Fifth Circuit interprets Rule 9 strictly, "requiring a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008).

The complaint points to four specific occasions prior to January 6, 2014, where Comcast represented that it was prepared to make a stalking horse bid sufficient to satisfy all prepetition claims in full and return a 'significant' amount of equity to the Partners.  The complaint also points to several Comcast representations between January 6, 2014, and February 4, 2014, that it was prepared to bid on the Debtor, or substantially all of its assets, in an amount sufficient to satisfy all prepetition secured, administrative, and unsecured claims.[11]  The complaint alleges

---

[10] Fraudulent misrepresentation is a theory by which the plaintiff may prove fraud and is subsumed within the general tort of fraud.  *See Columbia/HCA Healthcare Corp. v. Cottey*, 72 S.W.3d 735, 744 (Tex. App.—Waco 2002, no pet.).

[11] Specifically, a January 6, 2014, letter; a January 10, 2014, filing before this Court; and oral statements made at the February 4, 2014, hearing on the motion to dismiss.  Comcast argues that these statements are too vague and ambiguous to be actionable.  *See Cadle Co. v. Davis*, 2010 WL 5545389 at *8 (Tex. App.—San Antonio Dec. 29, 2010, pet. denied) ("[A] promise of future performance is actionable if at the time the promise was made the promisor intended to deceive and had no intention of performing.  Promises must be specific and definite enough for it to be *reasonable to rely* upon them") (emphasis added).  In the January 6, 2014, letter, Defendant Pick stated that "Comcast Owner remains prepared to make a 'stalking horse' bid for the acquisition of the Network."  (ECF No. 1 at 30).  He then described the terms of the bid in enough detail that it would satisfy in full all prepetition secured, administrative, priority, and general unsecured claims, including amounts necessary to cure existing defaults under the Media Rights Agreements.  In the January 10, 2014, motion to terminate exclusivity, Comcast stated it was prepared to make a stalking horse bid, acquire the Debtor, and "thus permit the Network successfully to reorganize in bankruptcy."

These statements could be definite enough to induce reliance, particularly when compared to cases where courts have found the alleged misrepresentations to be too vague or ambiguous.  *See, e.g.*, *In re Media Arts Grp., Inc.*, 116

that the Debtor relied on such representations to its detriment, causing the Debtor to lose opportunities to "(i) restructure or reorganize itself such that it could maintain its Assets and run a profitable business, (ii) sell such Assets for an amount sufficient to fully satisfy the claims of its creditors and provide a distribution to its equity owners, or (iii) dissolve in order to prevent further harm to the Debtor's creditors." (ECF No. 1 at 42).

The complaint has unquestionably met the first three prongs of the *Dorsey* analysis, i.e., it has identified specific statements contended to be fraudulent, it identified the speaker, and stated when and where the statements were made. Comcast instead focuses its argument on the complaint's tactic of pleading fraudulent intent on information and belief. While it is true that the complaint does not provide any specific evidence of Comcast's fraudulent intent, this can hardly be surprising given that, in the context of fraud, such facts are often "peculiarly within the opposing party's knowledge. . . ." *See Dorsey*, 540 F.3d at 339. Nevertheless, a fraud claim may not be based on speculative and conclusory allegations. *Id.*

Although Comcast points to several cases dealing with the even more stringent pleading requirements of the Private Securities Litigation Reform Act, it is correct that even in the context of generic common-law fraud, Rule 9 still incorporates an element of scienter. *Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009). A plaintiff must show either motive to commit fraud or special circumstances indicating conscious behavior on the part of the defendant. *Id.* A motive universal among rational business actors, such as the desire to pay a lower price for something, cannot support an inference of fraud under

---

S.W.3d 900, 909 (Tex. App.—Houston [14th Dist.] 2003) (holding that the statement 'don't worry about it' in regards to an arbitration clause was too vague to constitute a false or material representation); *O'Leary v. JP Morgan Chase Bank N.A.*, 2014 WL 1494083 at *7 (N.D. Tex. Apr. 15, 2014) (holding that a bank's representation that the plaintiff's situation "could be resolved" was vague and indefinite). Unlike Comcast's earlier statements, these statements were not conditioned on the deal closing by the end of the year. Furthermore, the cumulative effect of Comcast repeating its intention to make a stalking horse bid on the Debtor at least eight times cannot be ignored.

Texas law.  *See Flaherty*, 565 F.3d at 213.  Instead, a plaintiff must allege sufficient facts to support a *cogent and compelling* inference of fraudulent intent to meet the scienter requirement for fraud.  *Id.* at 210.  Put another way, a complaint's general averment of the defendant's knowledge of material falsity is insufficient "unless the complaint *also* sets forth specific facts that makes it reasonable to believe that defendant knew that a statement was materially false or misleading."  *Tuchman v. DCS Commc'n Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (emphasis in original) (citing *Dileo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990)).

The *Flaherty* court found a complaint did not meet the Rule 9 scienter threshold where a group of former shareholders sued TXU Corp. after they had participated in tender offer whereby TXU repurchased up to 10 million shares of its common stock.  *Flaherty*, 565 F.3d at 204-05.  Several weeks after the plaintiffs had sold their shares, TXU announced a dramatic increase in the common stock dividend, which caused the value of the shares to increase by approximately 20%.  Plaintiffs sued, alleging that TXU directors fraudulently represented prior to the tender offer that the company had no plans to increase its dividend for several years.  *Id.*  Although the court noted that the timing of TXU's dividend announcement was suspicious, it found that the alleged motive—the desire to complete a financially successful tender offer—was insufficient to establish an inference of fraud.  *Id.* at 213.  The court also took note of the fact that any alleged misrepresentations with regards to TXU's dividend plans were accompanied with a disclaimer stating that the company was currently "reevaluating" its dividend policy and that it was subject to change.  *Id.* at 204.

Similarly, in *Tuchman* the Fifth Circuit affirmed the dismissal of a securities-fraud complaint where DCS, the manufacturer of call-routing and switching equipment, delivered faulty equipment to various telephone operators which caused extended systems failures

throughout swaths of the United States. *Tuchman*, 14 F.3d at 1063. The plaintiffs filed a complaint with both federal securities fraud and state common-law fraud claims the day after high-ranking DCS officials testified before a congressional subcommittee. *Id.* at 1064. According to the complaint, the defendants made false statements touting DCS's equipment as innovative, sophisticated, reliable, and efficient as well as providing overly optimistic estimations of the company's health for the sole purpose of increasing its market share and propping up the stock value. *Id.* at 1068. Given that almost every corporation in America wants to increase both its market share and stock value, and that the complaint's only alleged misrepresentations were vague statements that DCS had a "commitment to quality" and the like, the court found that it could not infer fraudulent intent.

By contrast, the complaint here alleges that Comcast intended to utilize its role both as an insider in the Debtor and as a major market player to scare away competition and drive down the Debtor's price in order to acquire its assets cheaply. (*See, e.g.*, ECF No. 1 at 36 par. 73). Unlike in *Tuchman* and *Flaherty*, where the general averments of fraudulent intent were insufficient, the complaint contains specific factual allegations which support a cogent and compelling inference of fraud. The first such fact is the general timing of Comcast's Notice that it was no longer prepared to purchase the Debtor. According to the complaint, the last time Comcast made any sort of statement that it was prepared to purchase the Debtor was at the February 4, 2014, hearing on the motion to dismiss, the *same day* the Court issued the Order for Relief. Why was Comcast no longer willing to provide a stalking horse bid as soon as it won on the issue of the involuntary petition?

Second, the Notice itself claimed that "much has happened . . . in the nearly six months since this involuntary case was filed," and "in light of these developments," Comcast was no

longer prepared to purchase the Debtor.  (Case No. 13-35998; ECF No. 326).  The Court must determine—after consideration of the evidence—whether there were significant changes in the six weeks between February 4 when Comcast was prepared to "back [its] belief" in the Debtor and March 17, 2014, when Comcast filed the Notice.  The Notice claimed that much had happened in the preceding *six* months, but it appears that nothing so significant had occurred in the 4½ months between September 27, 2013, and February 4, 2014, that had forced Comcast to back out.  Absent some sort of change that drove the Debtor's value downward over a 6-week period, the Court must determine why Comcast changed its position.

Third, according to the complaint, Comcast was both willing and actively attempting to acquire the Debtor after it had filed the March 17 Notice, albeit at sharply reduced price. Comcast argues that it was the deteriorating relationship between the parties that forced it to change its mind, particularly because the Astros were suing it for fraud.  This would certainly be plausible if Comcast had announced its intention to withdraw once it was sued in November 2013, but it took Comcast four additional months to file the Notice.  If this allegation is true, then clearly Comcast was not so perturbed by the Astros lawsuit that it wanted to stay away from the Debtor.

Accordingly, the scienter issue is sufficiently pled to mandate further inquiry in a trial.

b.  Ogle has sufficiently pleaded reliance

Comcast challenges whether the complaint has alleged actual and justifiable reliance for two reasons.  First, it questions how the Debtor could have relied on Comcast's alleged misrepresentations by choosing not to contest the petition.  The complaint alleges that the Rockets could have joined the Astros in contesting the involuntary petition, but they were induced to join the involuntary petition by Comcast's assurances that it would make a stalking

horse bid.  Comcast argues that only the alleged reliance of *the Debtor*, not a third party such as the Rockets, is relevant to a fraud claim.  *See* Restatement (Second) of Torts § 537 (1977) ("The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it, *but only if*, (a) he relies on the misrepresentation in acting or refraining from action, and (b) his reliance is justifiable") (emphasis added).

While Comcast is correct that the reliance of a third party may not be considered, in this case, the Rockets were not a third party.  The Rockets Director was entitled to vote whether to contest the petition.  If the Rockets Director—a member of the governing body of the Debtor— was induced to not contest the petition, as the complaint alleges, then the Debtor in effect relied on the representations.   "It is axiomatic that corporations cannot speak or act except through individuals."  *Keyser v. Miller*, 47 S.W.3d 728, 733 (Tex. App.—Houston [1st Dist.] 2001), *rev'd on other grounds Miller v. Keyser*, 90 S.W.3d 712, 720 (Tex. 2002).

Comcast argues further that there can be no reliance on its alleged misrepresentations because the Debtor could not have contested the involuntary petition under any circumstances. As discussed above, the LLC Agreement required any decision to contest the involuntary petition be made on majority vote of the directors.  Section 5.8 of the LLC Agreement states that, in the case of a conflict of interest, a "Conflicted Director" would not be entitled to vote on the conflicted matter and that a majority vote of the remaining directors would carry.  The complaint alleges that the Comcast Directors were conflicted and accordingly not entitled to vote on whether to contest the involuntary petition.  It then states that without Comcast's assurances that it would provide a stalking horse bid, the Rockets Director would have voted to contest the petition along with the Astros Director, and the petition would have failed.[12]

---

[12] In its February, 12, 2014 Memorandum Opinion the Court found that only two of the Comcast Petitioning Creditors—Comcast Services and Comcast Lender—properly qualified as petitioning creditors pursuant to 11

Comcast challenges whether the Comcast Directors would actually have been conflicted pursuant to § 5.8 of the LLC Agreement, or alternatively, that the Astros Director and Rockets Director were similarly conflicted and also not entitled to vote to contest the petition.[13]   The actual language of § 5.8 is not particularly instructive, merely stating that a Conflicted Director "shall not be entitled to vote with respect to any matter in which the Member who elected such Director on any of such Member's Affiliates is interested or conflicted. . . ."   The term Conflicted Director is also not defined in the LLC Agreement.   While Comcast may have a bona fide defense that it was impossible for the Debtor to contest the petition, the Court must accept the complaint's well-pleaded allegation that, absent Comcast's representations, the Rockets Director would have joined with the Astros Director and successfully challenged the petition. The question of interpreting ambiguous contractual provisions is a question of fact, not law.   *See Buyse v. Colonial Sec. Serv., Inc.*, 2012 WL 3025843 at *4 (Del. Sup. Ct. July 19, 2012).[14]   The Court does not foreclose the possibility that Comcast is correct that its directors could have voted, or even that no directors could have voted.   Those are matters that will be resolved by an ultimate fact-finder.   Accordingly, Ogle has properly pleaded justifiable reliance.

c.   Damages

Finally, Comcast argues that the complaint fails to identify with particularity any harm caused by the Debtor's failure to contest the petition.   As to damages, the complaint alleges that throughout the negotiation process, numerous third parties stated they did not want to be

---

U.S.C. § 303.   *In re Hous. Reg'l Sports Network, LP*, 505 B.R. 468, 473-74 (Bankr. S.D. Tex. 2014).   If the additional petitioning creditors had not joined in the petition, then the petition would have been dismissed had it been challenged by the Debtor.   Although the Court concluded that the Debtor could not have contested the petition because the Comcast Directors would have voted against it, the Court never considered whether the Comcast Directors were conflicted or what would happen if the Rockets had not joined with Comcast.

[13] It argues that the Rockets' and Astros' interest in the bankruptcy were the same as Comcast's, i.e., that of creditors generally.

[14] The LLC Agreement is governed by Delaware law.

involved in the Debtor's bankruptcy case because "it was their understanding that Comcast would be buying the Debtor out of bankruptcy."  (ECF No. 1 at 28).  It also alleged that Fox affirmatively stated it would be willing to do a deal on better terms with the Debtor if the Debtor were not in bankruptcy and that DirecTV felt the bankruptcy was "getting ugly" and hurting the Debtor's value.  *Id.*  In addition, the complaint alleged that the Rockets broke off negotiations for a deal with DirecTV for the same terms Comcast was offering because it made more sense to continue its relationship with Comcast at the same price.

If all the complaint alleged—as Comcast argues—was that Comcast induced the Debtor to not challenge the bankruptcy and the bankruptcy proceedings ultimately caused the Debtor to lose value, then the complaint might be deficient.  But the complaint has alleged more than furnishing the condition which made the Debtor's injury possible.  *See Union Pump Co. v. Allbritton*, 898, S.W.2d 773, 776 (Tex. 1995).  The theory of the complaint is not that Comcast was a passive participant in a bankruptcy that ultimately resulted in a sale for a disappointing price; rather, the complaint alleges that the low price *was caused by* Comcast's interference.  If Comcast had not publicly proclaimed its intention to make a lucrative bid and then backed out at the last minute, Ogle claims the Debtor would not have sold for a bargain-basement price.  In support of this allegation, Ogle points to comments made by Fox that Comcast's presence made them reluctant to get involved in the bankruptcy as well as the Rockets backing out of the DirecTV negotiations in reliance on Comcast's representations.

"When properly pleaded and proved, consequential damages that are foreseeable and directly traceable to the fraud and result from it might be recoverable.  It is possible that, in the proper case, consequential damages could include foreseeable profits *from other business opportunities lost* as a result of the fraudulent misrepresentation."  *Formosa Plastics Corp. USA*

*v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 49 n.1 (Tex. 1998) (internal citations removed) (emphasis added).  Ogle has pleaded that the Debtor sold itself for a lower price than it would have absent Comcast's actions in the bankruptcy case.  Accordingly, he has properly stated a claim for common-law fraud.

*Fraud by Non-Disclosure*

The complaint alleges that Defendants harmed the Debtor by concealing or failing to disclose Comcast's lack of intent to actually submit a stalking horse bid for the Debtor when they had a duty to do so.  It further alleges that Bond, Ruth, Litner, Comcast Services, and NBCU failed to disclose material facts relating to Bond's conversations with DirecTV, i.e., that DirecTV told Bond that Comcast's proposed rate card was ten times too high.  To establish fraud by nondisclosure, plaintiffs must show (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (5) the defendant was deliberately silent when it had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff was injured as a result of acting without that knowledge.  *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied).

The fraud by nondisclosure claims that arise out of Bond's conversations with DirecTV must be dismissed for two reasons.  First, the Debtor would have had an equal opportunity to discover from DirecTV that the proposed rate card was too high.  The complaint alleges that both the Rockets and the Astros had numerous conversations with DirecTV regarding the potential purchase of the Debtor.  Ogle argues that because the conversations only related to the *purchase*

of the Debtor, not carriage, the Debtor did not have access to this information. But it was very clear to all parties involved that the lack of carriage was the primary reason behind the Debtor's financial struggles. Surely the Rockets and Astros, in their role as lead negotiators for the Debtor, could have inquired into potential carriage agreements with DirecTV. The question here is not whether the Debtor did in fact have knowledge of the undisclosed facts, but rather whether it had an equal opportunity to discover it. Given the Rockets' and Astros' numerous conversations with DirecTV, the Court finds that it did.

Second, Ogle cannot make out a claim for damages as a result of Bond's nondisclosure. According to the complaint, DirecTV was willing to match Comcast's price for the entire Debtor in February of 2014. Why would it matter that Comcast was apparently asking too high a price for carriage? The fact that a company was interested in a lower price for a service is not the sort of proprietary information that could have given the Debtor a competitive advantage in negotiations. The Court fails to understand how, even if the Debtor somehow did not have access to this information, it could have enabled the Debtor to obtain better terms than those it ultimately obtained in the DirecTV/AT&T deal.

As to Ogle's nondisclosure claims relating to Comcast's alleged failure to disclose that it had no intention of purchasing the Debtor, the claim must fail for lack of a legal duty. A duty to speak arises in four circumstances: (1) a fiduciary or other special relationship between the parties; (2) new information which makes a defendant's earlier misrepresentation misleading or untrue; (3) a defendant conveys a false impression by making a partial disclosure; or (4) a defendant who voluntarily discloses information has a duty to disclose the whole truth. *Holland v. Thompson*, 338 S.W.3d 586, 598 (Tex. App.—El Paso 2010, pet. denied). Other than a rote regurgitation of these circumstances, the complaint alleges only that Defendants Litner and Ruth

owed a fiduciary duty to the Debtor due to their positions on the board of directors.  However, the complaint never alleges that either Ruth or Litner knew of Comcast's intent to make a fraudulent stalking horse bid.  As the complaint does not allege a duty to disclose on the part of the Comcast Defendants, the fraud by nondisclosure claim fails.

Accordingly, the fraud by nondisclosure claims are dismissed as to all defendants.

*Business Disparagement*

Ogle alleges that Comcast Lender, Comcast Services, Comcast Media, and Comcast California published a disparaging written statement about the Debtor's value and financial health by failing to file the Notice under seal.  Because the Notice was in the public record it was quickly re-published in the Houston Chronicle and seen by AT&T, DirecTV, and other MVPDs.  Ogle alleges the Notice was false, because at the time it was published (i) Comcast still intended on purchasing the Debtor, (ii) the Debtor still had significant value, and (iii) there had been no material changes in the Debtor's circumstances to justify Comcast's reversal of course.

To prevail on a business disparagement claim, a plaintiff must show that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, and (iv) that resulted in special damages to the plaintiff.  *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).  Comcast primarily challenges the third element, i.e., that the Notice was absolutely privileged when filed.  "Communications made in the due course of a judicial proceeding are absolutely privileged and will not serve as the basis of a civil action for libel, slander, or business disparagement, regardless of the negligence or malice with which they are made.  This privilege extends to any statements . . . made in open court, pre-trial hearings, depositions, affidavits, *and any pleadings or other papers in the case*."  *Fitzmaurice v. Jones*, 417 S.W.3d 627, 633 (Tex. App.—Houston [14th Dist.] 2013, no pet.)

(internal citations removed) (emphasis added).   Nevertheless, in order for a statement in a judicial proceeding to be privileged it must bear at least some relation to the proceeding.  *James v. Brown*, 637 S.W.2d 914, 917 (Tex. 1982) (citing Restatement (Second) of Torts § 588 (1981)).  Determining whether an allegedly defamatory communication is related to a proposed or existing judicial proceeding is a question of law, but all doubts should be resolved in favor of privilege.  *Fitzmaurice*, 417 S.W.3d at 633.

Ogle argues the Notice was not related to the bankruptcy proceeding because it did not advance any Comcast argument or request for relief in the bankruptcy.  This argument must be rejected.  Setting aside Comcast's motive, Comcast's intention vis-à-vis the stalking horse bid bore a clear relation to the Debtor's prospects for reorganization.  Having informed the Court of its intention to bid (a fact that Ogle claims drove the bankruptcy proceeding), Comcast's counsel was duty bound to inform the Court of the change.  In the alternative, Ogle argues that Comcast contractually waived any privilege by virtue of the LP Agreement, the LLC Agreement, and the Comcast Services Agreement.[15]  He cites in support of this proposition a case where the plaintiff sued the defendant for breach of contract and fraudulent inducement after the defendant allegedly failed to make good upon a settlement agreement.  *Tulloch v. JPMorgan Chase & Co.*, 2006 WL 197009 at *1 (S.D. Tex. Jan. 24, 2006).  The plaintiff attached a copy of the settlement agreement in question to his original petition.  *Id.*  The defendant counterclaimed for breach of contract, claiming that the plaintiff had violated the settlement agreement's express confidentiality clause by attaching it to the petition and filing it in court.  *Id.*  In defense of the

---

[15] For example, Section 6.8 of the Comcast Services Agreement provided that "[e]ach of the Parties agrees that both the terms and conditions of this Agreement and the Confidential Materials will be kept confidential by each Party and its respective employees and will not be disclosed in any manner. . . .  As used herein, the term "Confidential Materials" means any information or materials, whether oral, tangible or intangible, concerning the General Partner, its Subsidiaries (as defined in the LLC Agreement) and their businesses, markets, products, prospects and finances in such Party's possession."  (ECF No. 1-1 at 19).

counterclaim, the plaintiff claimed he was immune from all civil liability due to Texas's absolute privileges for judicial communications. The court disagreed, finding "that the plaintiff's decision to attach an unredacted copy of the Release Agreement to his publicly filed Original Petition [does not further] the public policy that the Texas Supreme Court has said the absolute privilege is intended to promote, i.e., that citizens ought to have the unqualified right to appeal to the civil courts for redress, without fear of being called to answer damages *for libel*." *Id.* at *7 (internal citations omitted) (emphasis added).

A business disparagement claim is closely related to a libel claim, differing mainly in that libel (or defamation) actions seek to protect the personal reputation of an injured party whereas business disparagement protects economic interests. *Fitzmaurice*, 417 S.W.3d at 632. Ogle is attempting to sue Comcast for libel in a business setting solely on the basis of a filing before this Court, which is precisely what Texas's absolute privilege is designed to prevent. Although *Tulloch* opens the door for a breach of contract claim based on a judicial filing, that is not the claim the Court is presented with here. Accordingly, the business disparagement claim is dismissed based on privilege.

*Tortious Interference with Prospective Business Relations*

Next, Ogle asserts a claim against Comcast Lender, Comcast Services, Comcast Media, Comcast California, Comcast Corp., Comcast Partner, and Pick for tortious interference with prospective business relations. The elements of tortious interference are: (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did the act with the conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially certain to occur as

a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the interference.  *Cmty. Initiatives, Inc. v. Chase Bank of Tex.*, 153 S.W.3d 270, 183-84 (Tex. App.—El Paso 2004, no pet.).

Comcast challenges whether the complaint has alleged facts sufficient to show a "reasonable probability" that the Debtor would have entered into a contractual relationship with a third party.  In order to prevail on a tortious interference claim, "it need not be absolutely certain that the prospective contract would have been made were it not for such interference; A reasonable assurance thereof, in view of all the circumstances, is sufficient."  *Cooper v. Steen*, 318 S.W.2d 750, 757 (Tex. Civ. App.—Dallas 1958, no writ).  The plaintiff need not prove that but for the tortious conduct a contract would have been made, rather, the court must evaluate in light of the circumstances whether the plaintiff had a reasonable probability of entering into a contract.  *Suprise v. DeKock*, 84 S.W.3d 378, 381-82 (Tex. App.—Corpus Christi 2002, no pet.).

Comcast asserts that the complaint does not point to a specific contractual relationship that was reasonably probable because the Rockets, acting on behalf of the Debtor, rejected a deal with AT&T/DirecTV.  Of course, the complaint alleges that the Rockets turned down this potential deal *because of Comcast's tortious conduct*.  Given that the complaint explicitly states DirecTV/AT&T was willing to do a deal on the exact same terms as Comcast, the Court finds the complaint has sufficiently alleged it was reasonably probable that, absent interference, the Debtor would have entered into a contract with DirecTV/AT&T.

As to the second and third elements—an independently tortious act and a desire to prevent the prospective business relationship—the Court has already discussed the independently tortious act of fraud and its requisite intent in great detail.  These elements are sufficiently alleged.

Finally, Comcast argues that its alleged tortious interference could not have proximately caused any injury to the Debtor because it ultimately consummated a transaction with DirecTV/AT&T.  Comcast relies primarily on *U.S. Enercorp, Ltd. v. SDC Montana Bakken Exploration, LLC*, a case where the defendant allegedly approached a third party the plaintiff was negotiating with, alleging defects in plaintiff's title to certain oil producing lands.  966 F.Supp.2d 690, 694-95 (W.D. Tex. 2013).  The plaintiff ultimately reached a deal with the third party but at worse terms than originally contemplated.  *Id.* at 702-03.  The court dismissed the tortious interference claim, holding that:

> Because Enercorp acknowledges that it did consummate a contract with SEPCO, it must, at a minimum, plead facts that would indicate that Defendants prevented the formation of *another* contract—one that was separate and distinct from the one eventually consummated.  It has not done so.  Instead, the closest Enercorp comes to pleading that there were two distinct contracts—or even two distinct periods of contract negotiation—is its allegation that it sustained damages measured by the difference in value between the amounts Enercorp would have realized under the contract . . . that would have been formed . . . and the amounts Enercorp actually realized. . . .

*Id.* at 702-03.

In reaching this conclusion, the court relied solely on a Fourth Circuit case applying South Carolina law, which held that "[a] claim for prospective interference cannot stand where the plaintiff is able to consummate a contract with another party."  *BCD LLC v. BMW Mfg. Co.*, 360 Fed. Appx. 428, 436 (4th Cir. 2010) (citing *Egrets Pointe Townhouses Prop. Owners Ass'n v. Fairfield Comts., Inc.*, 870 F.Supp. 10, 116 (D.S.C. 1994)).  The *U.S. Enercorp* court also acknowledged that it was "unaware of . . . any Texas case in which a contract was consummated but the plaintiff was nevertheless successful on a claim for tortious interference with a prospective business relationship."  966 F.Supp.2d at 703.  However, in *Surprise v. DeKock*, the Texas Court of Appeals held that a plaintiff had successfully stated a claim for tortious

interference where he had successfully consummated a contract but was "forced to sell the property at less than fair-market value." 84 S.W.3d 378, 380 (Tex. App.—Corpus Christi 2002, no pet.). *But see Tex. Disposal Sys. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 590-91 (Tex. App.—Austin 2007, pet. denied) (holding that a mere delay in the execution of a contract did not constitute actual harm to the plaintiff).

Despite the somewhat inconsistent case law on the issue, Ogle has nevertheless sufficiently pleaded the existence of two separate prospective contracts. According to the complaint, the Rockets broke off negotiations with AT&T and DirecTV on February 3, 2014, because they were not willing to exceed Comcast's terms. Then, more than two months later, the *Astros* reached out to the CEO of AT&T shortly after AT&T and DirecTV had announced their intention to merge on May 18, 2014. At that point, the teams began negotiations for a DirecTV/AT&T deal with substantially different terms than the original deal contemplated before Comcast issued the Notice. Because the complaint has alleged two separate and distinct prospective contracts with distinct periods of contract negotiations, Ogle has sufficiently alleged proximate harm. Comcast's motion to dismiss as to the tortious interference claim is denied.

*Promissory Estoppel*

Ogle further alleges that the Comcast Defendants repeatedly promised the Debtor that a Comcast entity would bid on the Debtor during the bankruptcy in an amount at least sufficient to satisfy all secured, unsecured, priority, and administrative claims and that the Debtor relied on these promises to its detriment.

Although promissory estoppel is defensive in nature, it is an available cause of action to a promisee who relied to his detriment on an otherwise unenforceable promise. *Frost Crushed Stone Co. v. Odell Geer Const. Co.*, 110 S.W.3d 41, 44 (Tex. App.—Waco 2002, no pet.). The

function of the doctrine of promissory estoppel is to estop a promisor from denying the enforceability of the promise. *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965) (citing Restatement (First) of Contracts § 90 (1932)). In other words, it "prevents a party from insisting upon his strict legal rights"—i.e. the right to avoid the promise as not contractually binding— "when it would be unjust to allow him to enforce them." *Wheeler*, 398 S.W. 2d at 96. "The vital principle of estoppel is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by destroying the expectations upon which he acted." *Montgomery Indus. Int'l, Inc. v. Thomas Const. Co.*, 620 F.2d 91, 96 (5th Cir. 1980). The elements of promissory estoppel are: (1) a promise; (2) foreseeability of reliance thereon by the promisor; and (3) substantial reliance by the promisee to her detriment. *Garcia v. Lucero*, 366 S.W.3d 275, 280 (Tex. App.—El Paso 2012, no pet.).

Comcast challenges whether Ogle has alleged any actual promise. A promissory estoppel claim must be based on an 'actual' promise. *Davis v. Tex. Farm Bureau Ins.*, 470 S.W.3d 97, 108 (Tex. App.—Houston [1st Dist.] 2015, no. pet. h.). "The asserted 'promise' must be sufficiently specific and definite so that it would be reasonable and justified for the promisee to rely on it as a commitment to future action." *Id.* (citing *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 635 (Tex. App.—Houston [14th Dist.] 2012, pet. denied)). Comcast argues that its statements only "reflected at most an intent to potentially act in the future." (ECF No. 19 at 38). But what is a promise if not an intention to act in the future? *See* Restatement (Second) of Contracts § 2 (1981) ("A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.").

While Comcast is correct that by announcing its intention to make a stalking horse bid it had not committed to a contract, at the very least it manifested its intent to make an offer. The purpose of a stalking horse bid is to set a floor for the value of a debtor's assets and avoid low bids during the auction process. Ogle alleges that the teams relied on having this floor while they were negotiating with other MVPD's, and when Comcast failed to deliver the Debtor was left in a far worse bargaining position. Comcast argues that there can be no promissory estoppel because there was no guarantee that Comcast and the Debtor would have reached a deal, but "a promise need not be the functional equivalent of an offer to enter into a contract for it to support a claim of promissory estoppel." *Stewart v. Cendant Mobility Servs. Corp.*, 837 A.2d 736, 745 (Conn. 2003) (citing 3 A. Corbin, *Contracts* § 8.9 (Rev. Ed. 1996)). It is difficult to view Comcast's statements throughout the case as anything other than promises intended to induce reliance. As this Court has previously stated:

> Comcast, for reasons that I think are unclear, changed its course of conduct and decided that, rather than having an outcome *that it had assured us* in the beginning of the case would be one where every creditor was paid in full . . . changed course in the middle of the case. . . . Its own terms were materially different than those *initially promised* by Comcast because, under its own terms, not all claims, particularly the Teams', would have been fully paid.

(Case No. 13-35998; ECF No. 792 at 107) (emphasis added).

Comcast further challenges whether the complaint alleges foreseeable or justifiable reliance. These arguments have been addressed with regards to the common-law fraud claims. Ogle has stated a claim for promissory estoppel.

*Breach of Fiduciary Duty*

Ogle alleges that Ruth and Litner violated their fiduciary duties owed to the Debtor and its estate by failing to disclose material facts regarding Bond's conversations with DirecTV to the Debtor while at the same time disclosing the information to Comcast affiliates. The elements

of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and the defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach.  *Fred Loya Ins. Agency, Inc. v. Cohen*, 446 S.W.3d 913, 919 (Tex. App.—El Paso 2014, pet.denied).

The underlying facts of the fiduciary duty claim are essentially identical to fraud by nondisclosure claim which was dismissed for want of injury.  Here, Ogle again argues that the Debtor was harmed due to the nondisclosure because the lack of information deprived it of the ability to negotiate effectively.  But the Rockets did not have access to this information when it was allegedly close to striking a deal with DirecTV/AT&T for a much higher price.  Nor does the complaint allege how this information was helpful to the teams when they successfully negotiated the eventual deal with DirecTV/AT&T.[16]  Ogle also argues that Bond and Litner disclosed the information to Comcast affiliates, who used the information against the Debtor, but that allegation is not pleaded with any factual support.  Accordingly, the motion to dismiss is granted as to the breach of fiduciary duty claims.

*Breach of Contract*

Ogle alleges that Defendants Comcast Services and NBCU breached the Comcast Services Agreement in numerous ways.  First, he alleges that Defendants breached § 2.2(e) of the Services Agreement by refusing to formulate a new business plan prior to the bankruptcy.  Second, he alleges that they breached § 2.4 of the Services Agreement by failing to treat the Debtor in a similar regard as other Comcast-affiliated RSNs regardless of Comcast's ownership stake in the Debtor.  Finally, he alleges that the Defendants breached § 2.5 of the Services Agreement by failing to provide the Astros information and documents regarding the Debtor upon request and, similar to the fraud by nondisclosure and breach of fiduciary duty claims,

---

[16] Bond first informed the board of directors about the DirecTV conversations on April 15, 2015.  (ECF No. 1 at 37).

failing to pass along information learned from DirecTV regarding the Debtor's proposed carriage rates.

Section 6.2 of the Services Agreement provides that the contract is governed by Delaware law. In Delaware, the elements of breach of contract are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages. *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005). Before turning to the specific alleged breaches, the Court will first address Comcast's argument that all breach of contract claims against NBCU must be dismissed. NBCU was not a party to the Comcast Services Agreement. As non-parties to a contract may not generally be sued for breach of contract, the complaint alleges that NBCU was an agent or alternatively a subcontractor to Comcast Services. However, under Delaware law, an agent may not be held liable for breach of contract where the principal has been disclosed. *Colbert v. Goodville Mut. Cas. Co.*, 2010 WL 2636860 at *3 n. 16 (Del. Super. Ct. June 30, 2010). Nor can NBCU be held liable as a subcontractor, because per § 2.6 of the Services Agreement: "[a]s between Comcast [Services] and Network, Comcast [Services] shall be responsible for any breach of this Agreement by any subcontractor that is performing Services that are otherwise required to be performed directly by Comcast [Services] pursuant to Attachment B." (ECF No. 1-1 at 7). Accordingly, the breach of contract claims against NBCU must be dismissed.

i. Section 2.2(e)

Section 2.2(e) of the Services Agreement states that "[n]otwithstanding anything to the contrary contained herein, Comcast agrees to meaningfully consult with Network and to consider, in good faith, Network concerns in providing the Services hereunder and to take such actions in response to such concerns as it deems advisable." (ECF No. 1-1 at 5). Ogle alleges

that Comcast Services violated this provision in 2012 when the Astros Partner and Astros Member repeatedly requested that Comcast Services formulate a new business plan for the Debtor and were rejected.  During a meeting of the board of directors, the Astros Director again brought up the issue of a new business plan but was told by Comcast Services that his concerns were premature.  (ECF No. 1 at 17).  Ogle alleges that the failure to formulate a new business plan ran contrary to Comcast Services' enumerated duties under Attachment B to the Services Agreement, which reads as follows:

    a.  development and implementation of affiliate sales distribution strategies for the Program Service and other Network content via applicable forms of media distribution, including distribution via cable, satellite, telco or other form of multichannel video distribution, VOD platforms, HD, 3D or other enhanced feeds, broadband and wireless/mobile platforms, all in accordance with reasonable parameters established by Network;

    b.  recommendation of a Network distribution "footprint" and applicable rate-based zones within such footprint;

    c.  development of a launch sales pitch and marketing plan with implementation of any such marketing plan to be approved (such approval not to be unreasonably withheld, conditioned or delayed) and performed by Network and any associated costs constituting Out-of-Pocket Costs payable by Network; (for the avoidance of doubt, such approval right is expressly limited to Network's approval of the sales pitch and marketing plan and shall not be construed so as to provide Network with any approval rights with respect to the affiliate sales distribution strategies or any other affiliate sales services);

    d.  identification of prospect MVPDs, including primary cable, satellite, "telco" and other MVPDs;

    …

    j.  At the request of Network, report to, consult with and provide relevant documents and other information to Network regarding Network's affiliate sales and distribution matters and take further direction from Network if and to the extent required by the Transaction Documents. . . .

(ECF No. 1-1 at 29-30).

    Notably absent from these provisions is any mention of a "business plan."  Ogle argues that it is plausible that a director of a RSN seeking distribution would *expect* these items to be

included in a business plan, but this amounts to no more than reading into the contract provisions which do not exist.  The Services Agreement makes no mention of a business plan, and even if it did, the complaint has already alleged that Comcast Services prepared a business plan in 2012. (ECF No. 1 at 15).  Ogle has pointed to no provision requiring Comcast Services to formulate a second business plan after it had already formulated a first only a year prior.  Furthermore, § 2.2(e) only required Comcast Services to 'consider' the Debtor's requests and 'take such actions in response to such concerns as it deems advisable.'  Ogle has alleged nothing which would indicate that Comcast Services did not simply consider the Astros' request but view it as unadvisable.  Unlike the ambiguous contractual provision regarding conflicted directors, the interpretation of an unambiguous contract is a question of law.  *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del. 1997).  Under the plain language of the contract, Ogle has alleged no breach of § 2.2(e) and the claim must be dismissed.

The Court also notes that the failure to provide the business plan was harmless.  It became apparent during the trial of the involuntary petition that Comcast had no business plan that would show profitability with the reduced revenue package that it advocated.  It was not the failure to produce a business plan that caused harm; it was the absence of a reasonable business alternative.

ii.  Section 2.5

Next, Ogle alleges that Comcast Services violated § 2.5 of the Services Agreement, which provides that:

> Comcast acknowledges and agrees that all information relating to Network that is obtained by Comcast in connection with the provision by Comcast of the Services, including any information, analyses, summaries, notes, data and other documents and materials prepared by Comcast containing or reflecting or generated from such information . . . is the property of Network, and Comcast shall promptly provide all such information to Network at the request of Network

and such information shall be treated as Confidential Materials of Network in accordance with Section 6.8 hereof.

(ECF No. 1-1 at 6-7).  Comcast allegedly violated this provision in two ways.  First, during the time the Astros were lead negotiator for the Debtor, certain counterparties requested information and documents related to the Debtor which were maintained by Comcast Services/NBCU.  (ECF No. 1 at 28).  Comcast "refused to release the requested information in a timely manner, in violation of the Comcast Services Agreement."  *Id.* at 29.  Second, Ogle cites Comcast's failure to pass along the content of Bond's discussions with DirecTV.

As discussed with both the fraud by nondisclosure and breach of fiduciary duty claims, Ogle has failed to plead damages with regard to the Bond discussions.  For this reason, Comcast's alleged failure to turn this information over cannot sustain a breach of contract claim.

Turning to the information requested by the Astros, Comcast first argues that Ogle has failed to plead with specificity the exact information requested nor exactly how long Comcast delayed in turning the information over.  It cites in support a case from New York where the court dismissed as merely conclusory the "bare allegations that Defendants 'failed to make timely payments. . . .'"  *Arma v. Buyseasons, Inc.*, 591 F. Supp.2d 637, 642 (S.D.N.Y. 2008) (applying the pleading standards of Fed. R. Civ. P. 8(a)).  Ogle argues that it has satisfied the notice standards of Rule 8(a) because it has identified that *some* information was withheld during the time the Astros were lead negotiator for the Debtor.  But without identifying what information was withheld, for how long, or even if Comcast ultimately disclosed the information, it cannot be said that Ogle has met even the notice standard of Rule 8(a).

Moreover, Ogle has not pleaded any damages stemming from the alleged breach.  He argues that "it is beyond dispute that the Network was losing an enormous amount of money" due to Comcast's failure to obtain carriage and that these losses caused Comcast to file an

involuntary petition, resulting in even more damages.  However, Ogle fails to show how these losses relate to this particular breach of contract claim.  Whether Comcast responded to requests for information from the Astros *post-petition* had nothing to do with the Debtor's pre-petition losses.  Nor can Ogle demonstrate that the Astros were put in a worse bargaining position due to the lack of disclosure, because according to the complaint "[b]y December 12, 2013, the Astros were still negotiating with DirecTV regarding a potential restructuring or reorganization of the Debtor, but had not yet finalized a deal."  (ECF No. 1 at 29).  Then, once the Rockets took over the role as lead negotiator they were able to successfully continue negotiations until they withdrew for reasons entirely unrelated to the failure to hand over the documents.  Nowhere in the complaint does it allege that the actual failure to turn over information to the Debtor caused it any harm.  Accordingly, all claims relating to § 2.5 of the Services Agreement are dismissed.

iii.  Section 2.4

Finally, Ogle alleges that Comcast Services violated § 2.4 of the Services Agreement, which provides, in part:

> (b) Comcast shall devote such time, personnel and resources as are reasonably necessary to, and shall, ensure the proper, timely and efficient provision of such Services to Network in a manner that is, under the circumstances, at a minimum consistent in all material respects with . . . the same highest level and quality of service that Comcast uses when providing similar services to *any other Comcast Related RSN*. . . .
>
> (c) In providing the Services, in general, Comcast shall allocate its time, personnel and resources equitably and fairly as between the Network and all other Comcast Related RSNs based on the totality of the circumstances and shall not base such allocation of time, personnel and resources on the amount or nature of any Comcast Party's ownership interest in such Comcast-Related RSN.
>
> (d) With respect to all other purchases of products or services from non-Affiliate third-parties negotiated by Comcast on Network's behalf, Comcast shall use *commercially reasonable efforts* to obtain for Network the best pricing, benefits and other terms available to Network under the circumstances.

(ECF No. 1-1 at 5-6).

Ogle alleges Comcast Services violated these provisions by failing to secure a single affiliation agreement with an MVPD in the 35 months of Comcast's involvement with the Debtor.   Comcast allegedly failed to treat the Debtor on the same footing as fully-owned Comcast RSNs by not including the Debtor in the global Suddenlink deal which included every Comcast-affiliated RSN *except for* the Debtor.   The complaint questions how, if Comcast truly had used commercially reasonable efforts to obtain carriage for the Debtor, it could have failed to reach a single carriage agreement with an MVPD.

While Comcast is correct that § 2.4(d)'s requirement that Comcast use all commercially reasonable efforts to obtain the best pricing and benefits for the Debtor only applied to the *purchase* of products or services from third parties—not the negotiation of carriage agreements—the complaint has still alleged that Comcast did not allocate its time, personnel, and resources equitably.   Comcast argues that, in fact, the lack of inclusion in the Suddenlink deal or any other deal says nothing about the quality of service or allocation of resources that Comcast Services provided.   This misses the mark.   The complaint alleges that the Debtor was deliberately carved out of the Suddenlink deal.[17]   If this is true—and the Court must accept it as true—then Comcast Services did *not* allocate time and resources equally to the Debtor because negotiating the Suddenlink deal of course required an expenditure of time and resources. Accordingly, Ogle has stated a claim for breach of §§ 2.4(b) and (c) of the Services Agreement.

*Counts 8 Through 13*

---

[17] The complaint states "[i]n fact, Comcast had indicated to the Debtor that it would use it strength in other markets to get carriage for CSN Houston at financially viable rates.  Yet, when negotiating with MVPDs regarding carriage for the Debtor, Comcast Services/NBCU did not leverage this market power as they indicated they would.  Comcast did, however, on information and belief, employ this strategy with its other Comast RSNs."  (ECF No. 1 at 18).

Ogle has pleaded various remedies and theories of liability.  As both parties agree these are not true causes of action, the Court will not address the counts for vicarious liability, piercing the corporate veil, attorney's fees, and exemplary damages.  However, Comcast specifically challenges the aiding and abetting and conspiracy counts.

The Texas Supreme Court has never recognized aiding and abetting in a fraud or tortious interference case.  *See Ernst & Young L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 n. 7 (Tex. 2001).  Although the tort has been recognized in the breach of fiduciary context, all breach of fiduciary claims in this lawsuit are being dismissed.  *See In re Today's Destiny, Inc.*, 388 B.R. 737, 750 (Bankr. S.D. Tex. 2008).  Comcast points to several federal district court cases applying Texas law who have declined to recognize claims of aiding and abetting fraud.  *See, e.g.*, *Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc.*, 2008 WL 3925272 at *14 (N.D. Tex. Aug. 27, 2008); *N.Y. Pizzeria, Inc. v. Syal*, 56 F.Supp.3d 875, 884 (S.D. Tex. 2014). In response, Ogle cites two Texas appellate cases that have recognized claims for aiding and abetting fraud.[18]  *See Crisp v. Sw. Bancshares leasing Co.*, 586 S.W.2d 61, 613 (Tex. Civ. App.—Amarillo 1979, writ ref'd n.r.e.); *King v. Shawver*, 30 S.W.2d 930, 932 (Tex. Civ. App.— Fort Worth 1930, no writ.).

In the absence of guidance from the Texas Supreme Court, the Court must make an *Erie* guess and determine, to the best of its ability, how the Texas Supreme Court would rule if confronted by the issue.  *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000).  When making an *Erie* guess, the Court looks to: (1) lower state court decisions and Supreme Court dicta, (2) the general rule on the issue, (3) the rule in other states looked to by Texas courts when they formulate the substantive law of Texas, and (4) other available legal

---

[18] Ogle also argues that aiding and abetting business disparagement may be a cause of action, but this Court has dismissed the business disparagement claim.

sources, such as treatises and law review commentaries.  *See Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 397 (5th Cir. 1986).

The Restatement (Second) of Torts recognizes aiding and abetting fraud as a cause of action, holding a person liable where he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. . . ." Restatement (Second) of Torts § 876(b) (1979); *see also Aetna Cas. And Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 533 (6th Cir. 2000); *State ex rel. McCormac v. Qwest Comm. Intern., Inc.*, 904 A.2d 775, 783 (N.J. Sup. Ct. App. Div. 2006) (holding that the Restatement is consistent with common usage of the terms aiding and abetting).  While the Texas Supreme Court has not adopted § 876(b), it noted that "[m]any jurisdictions have recognized liability in at least some circumstances for such substantial assistance. . . ."  *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) (referring to § 876(b)).  Furthermore, Texas has recognized aiding and abetting in the context of breach of fiduciary duty.  *See, e.g.*, *Span Enters. v. Wood*, 274 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

At least 28 states have held that a claim for aiding and abetting under § 876(b) exists. *See Dale v. Ala. Acquisitions, Inc.*, 203 F.Supp.2d 694, 700 n.5 (S.D. Miss. 2002).  If the weight of authority in other jurisdictions is that a cause of action can be recognized, "we presume that [state] courts *would adopt* the prevailing rule if called upon to do so."  *Hensley v. E.R. Carpenter Co.*, 633 F.2d 1106, 1109 (5th Cir. 1980).  Finally, federal courts in other jurisdictions have made an *Erie* guess and recognized a cause of action for aiding and abetting fraud.[19]  *See*

---

[19] By contrast, the Texas federal court cases upon which Comcast relies do not apply the *Erie* factors.  Instead, these cases decline to adopt aiding and abetting fraud because the Texas Supreme Court has not yet adopted aiding and abetting of fraud as a cause of action.  *See, e.g. Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc.*, 2008 WL 3925272 at *14 (N.D. Tex. Aug. 27, 2008); *N.Y. Pizzeria, Inc. v. Syal*, 56 F.Supp.3d 875, 884 (S.D. Tex. 2014).  Respectfully, the Court believes that to adopt this approach would mean that every *Erie* guess must be answered in the negative, because to even engage in an *Erie* guess necessarily means that a state supreme court has not addressed the issue.

*Hensley*, 633 F.2d at 1109 (applying Mississippi law); *Aetna Cas. And Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 533 (6th Cir. 2000) (applying Ohio law).  The Court is persuaded that Texas would recognize the tort of aiding and abetting fraud.

Comcast does not challenge the specific elements of an aiding and abetting claim, i.e., that (1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach.  Restatement (Second) of Torts § 876(b) (1979)).  Accordingly, the motion to dismiss as to the aiding and abetting fraud claim is denied.

Conspiracy is a 'derivative' claim predicated upon the commission of an underlying tort. *Tilton v. Marshall*, 925 S.W.2d 672, 680 (Tex. 1996).  It requires a combination of two or more persons to accomplish an unlawful purpose or a lawful purpose through unlawful means.  *Id.*  A meeting of the minds on the object or course of action is also required.  *ERI Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 881 (Tex. 2010).  Although Comcast challenges the existence of an underlying tort, Ogle has properly pleaded fraud and tortious interference.  As to the meeting of the minds, Ogle has only alleged that Defendants Pick, Comcast Services, Comcast Media, Comcast Lender, and Comcast California made repeated statements which they knew to be false. He has failed to "provide particularized facts establish[ing] a knowing agreement by each alleged co-conspirator to commit the fraud alleged."  *In re Enron Corp. Secs., Derivcative, & ERISA Litig.*, 761 F.Supp.2d 504, 558 (S.D. Tex. 2011).  In fact, by reading Ogle's complaint, it is entirely possible that each Defendant made these allegedly fraudulent statements on its own accord.  The only alleged fact which would hint at the existence of a conspiracy is that the Comcast Petitioning Creditors made their statements jointly in court filings, but that is not

enough to meet Rule 9(b)'s requirements for conspiracy in a fraud setting. Accordingly, the conspiracy claim is dismissed.

### Conclusion

The Court will issue an order consistent with this Memorandum Opinion.

SIGNED **March 15, 2016.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE